[No. C053982. Third Dist. Feb. 9, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD WILLIAM HAMLIN, Defendant and Appellant.

**COUNSEL**

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Melissa Lipon, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ROBIE, J.**—A jury found defendant Richard William Hamlin guilty of torture, making a criminal threat, three counts of inflicting corporal injury on his wife, and three counts of misdemeanor child abuse. The trial court sentenced him to life in prison for torture, the upper term of three years for making a criminal threat, and the upper term of four years for each of the three counts of inflicting corporal injury, but the court ordered the terms on the latter four counts stayed pursuant to Penal Code[1] section 654. The court also sentenced defendant to three consecutive terms of 180 days each for the child abuse counts.

On appeal, defendant raises numerous issues, including claims of insufficiency of the evidence, evidentiary errors, instructional errors, error in denying his new trial motion, and sentencing errors.

We reject defendant's challenges to the sufficiency of the evidence and most of his claims of error, with two exceptions: we conclude (1) the trial court erred in imposing upper terms on defendant's convictions for making a criminal threat and inflicting corporal injury on a spouse based on facts not found to exist by the jury, admitted by defendant, or justified based on defendant's record of prior convictions; and (2) the trial court erred in imposing a no-contact order on defendant. Accordingly, we will strike the no-contact order and remand the case to the trial court for resentencing. With these exceptions, defendant's convictions are affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND

Defendant and his wife, S., lived with their four children in El Dorado Hills. Sometime after 1999, defendant—who worked as a criminal defense attorney—began to physically abuse S. By 2003, the abuse escalated. According to S., defendant eventually abused her physically "on a daily basis, more than once a day." "He would strangle [her]. He would hit [her] in the head. He would throw [her] into furniture. He would hold [a] gun to [her] head. He would use a knife and push and just gradually increase the pressure and see how long he could push before he would break the skin . . . ." "He would hold lit cigarettes to [her] face." As a result, she had bruises, cuts, and split lips. Sometimes she had black eyes, and sometimes a swollen jaw.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

The escalation in the abuse was related to defendant's efforts to put together a million-dollar lawsuit against S.'s father for molesting her as a child. S. claimed at trial that the molestation never occurred, but defendant insisted that it did and that she had repressed her memories of it. Defendant would tell S. what her memories were, and she started believing him. Eventually, defendant focused almost all of his attention on the claims against S.'s father, and "if [she] didn't do [her] part, [she] would get beat." S. later testified that if she did not tell defendant what he wanted to hear, "[h]e would hit [her], he would hold a gun to [her] head and pull the thing on the gun. Ask [her] if [she] was ready to die. He would tell [her] that he was going to tie [her] up and leave [her] under the house or gut [her] and leave [her] out in some field or chop [her] into pieces."

By December 2003, defendant and S. were out of money and their house was in foreclosure. In January 2004, defendant obtained a book on "surviving ritualistic satanic abuse, or something to that effect," and defendant's story of S.'s molestation took on "a satanic cult theme." Around this time, defendant took to wearing "guns holstered through the house," and he also had a Taser and a sword in the bedroom.

While putting the molestation story together, defendant had S. contact old friends to see what they remembered. One of the friends was Lisa Clum. Once the "story evolved into the satanic theme," defendant "started weaving all kinds of people into the story," including Lisa Clum. According to defendant, "there was a plot to kill him and [they] were all involved in wanting to kill him. And it was all tied to this satanic cult that was supposedly in place." When Lisa Clum called and invited S. "to go to her church to listen to some talk that was being given," defendant "said that she was trying to set a trap to get [them] there to her church, which wasn't really a church, so that he would be killed."

By the time of Super Bowl Sunday in 2004, "[t]he story had evolved to where [S.] was now one of the child molesters of" her own children, and defendant wanted to record her confession. Defendant pointed a gun at S. and hit her until she told him what he wanted to hear.

In the first week of February 2004, an incident occurred in which defendant accidentally shot himself in the leg. Before law enforcement or medical personnel arrived, defendant told S. to "stick to the story," which at that time was that Lisa Clum and her husband, Rock, as well as S., "were all planning to kill [defendant]." Because S. had visible bruises on her, defendant told her "to say that Rock Clum . . . had attacked [her] in Starbucks' parking lot."

After defendant was taken to the hospital, S. spoke with a detective and "told him the story."

On the night of February 10, 2004, defendant "was trying to get something from [S.] as far as the story goes" and "he had [her] pinned up against the wall in the bedroom with the sword pointed to [her] left shoulder/chest area." He began swinging the sword around, and as S. tried to block the sword she was cut on the finger. Defendant then stabbed the sword into the mattress and threw S. into the wall. While choking her with one hand, he hit her in the side of the head with other. That night, defendant made S. sleep next to him at gunpoint.

The next day, they "were going to go to Granite Bay looking for Lisa [Clum] to kill her." S. arranged to drop the girls off with a neighbor, and defendant told the two boys to "put their paintballs in the freezer and pack their paintball guns in the van." Defendant took his derringer and the Taser and the sword. They drove to a Starbucks to look for Lisa. They then drove all over Granite Bay looking for an address. At first, S. was driving, and defendant was telling her she had "better find Lisa's house." After he started driving, "he started hitting [her] and being very threatening." "He hit [her] with his fist. He hit [her] with the gun in the face. He hit [her] with [the] Taser in the ribs and threw [her] into the window." As a result, her "nose was swollen" and it "felt like he had broke[n her] nose." Her "face was bloody and bruised and swollen" and her "ear was swollen." Eventually, when they could not find Lisa's house, defendant "dragged [S.] out of the car with a gun to the head and walked [her] out to [a] field." "He kept hitting [her] in the head and he held the gun to [her] head and asked if [she] was ready to die." He did not shoot her, however, and instead "dragged [her] back to the van, threw [her] in . . . , and . . . drove away." When they went to pick up the girls, defendant had her remain in the van with the boys pointing their paintball guns at her.

On February 22, 2004, when defendant and S. had returned home from somewhere and were coming into the house through the garage, defendant "started hitting [S.] and threw [her] into the trash cans and onto the floor and kicked [her]." He told her not to act like she was hurt, and she tried, but she was "unconsciously holding [her wrist] up because it was throbbing." Defendant picked up a metal pipe and hit her in the part of her arm that was starting to swell, then punched her in the face. S.'s nose began to bleed and she was coughing up blood. Defendant told her to go into the laundry room, and there he "started hitting [her] in the stomach and the ribs, hit [her] again in the face," "hit [her] in [her] ears," and "threw [her] into the wall." He then hit her in her left side with a piece of wood. As a result of this incident (sometimes referred to as the laundry room incident), S.'s nose "was very

swollen and bruised, th[e] side of [her] face . . . was bruised all the way down into [her] neck, and it was swollen, and [she had] black eyes."

On February 26, 2004, defendant and S. went to the sheriff's department and S. gave a detailed statement in which she admitted molesting her children. To explain the marks on her, she told the authorities Rock Clum had hit her. The authorities did not arrest S., but did send child protective services to remove the children from the home. Two days later, however, defendant was arrested.

On March 1, 2004, an examination conducted on S. at a hospital revealed the following injuries: both of her ears were extremely swollen and bruised, with one ear canal 90 percent swollen shut; she had bruising on her face from underneath her eye all the way down to underneath her chin; her nose was broken; she had bruising on her neck, shoulder, arm, abdomen, and thigh; and she had five broken ribs.

On March 2, 2004, a criminal complaint was filed against defendant (case No. P04CRF0132). In June 2004, a nine-count information was filed in the case.

The prosecution of defendant proceeded under the information until April 2005, when the grand jury returned an 18-count indictment (case No. P05CRF0161). The charges in the indictment were as follows:

1. Torture;

2. Child abuse (victim R.);

3. Child abuse (victim A.);

4. Child abuse (victim C.);

5. Assault by means of force likely to produce great bodily injury;

6. Making a criminal threat;

7. Inflicting corporal injury on a spouse;

8. False imprisonment by violence;

9. Inflicting corporal injury on a spouse (with a great bodily injury enhancement);

10. Assault with a deadly weapon or by means of force likely to produce great bodily injury;

11. Making a criminal threat (with an arming enhancement);

12. False imprisonment by violence (with an arming enhancement);

13. Inflicting corporal injury on a spouse;

14. Assault with a deadly weapon or by means of force likely to produce great bodily injury (with a firearm use enhancement);

15. Making a criminal threat (with a firearm use enhancement);

16. Discharge of a firearm with gross negligence;

17. Inflicting corporal injury on a spouse (with a great bodily injury enhancement); and

18. Assault by means of force likely to produce great bodily injury.

The case was ultimately tried to a jury from October 2005 through January 2006. The jury found defendant guilty of torture (count I), three counts of misdemeanor child abuse (lesser included offenses of counts II, III & IV), one count of making a criminal threat (count VI), and three counts of inflicting corporal injury on a spouse (counts IX, XIII & XVII). The jury rejected the great bodily injury enhancements on counts IX and XVII, found defendant not guilty on counts VII, VIII, X, XI, XII, XVI, and XVIII, and was unable to reach verdicts on counts V, XIV, and XV. The prosecution elected not to retry defendant on those counts.

After denying defendant's new trial motion, the court sentenced him to life in prison for torture, with the upper term of three years on the charge of making a criminal threat and the upper term of four years on each of three charges of inflicting corporal injury on a spouse, stayed pursuant to section 654. The court also sentenced defendant to three consecutive terms of 180 days each on the misdemeanor child abuse charges.

## DISCUSSION

### I

### *Sufficiency of the Evidence*

Defendant offers two different challenges to the sufficiency of the evidence to support his convictions. Before we address each of those arguments, we set forth the governing legal principles.

" 'The standard of review is well settled: On appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] " '[I]f the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.' " [Citation.] "The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] 'Although it is the duty of the [finder of fact] to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the [finder of fact], not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.' " ' [Citation.]

" 'An appellate court must accept logical inferences that the [finder of fact] might have drawn from the circumstantial evidence.' [Citation.] 'Before the judgment of the trial court can be set aside for the insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the [finder of fact].' " (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1572–1573 [43 Cal.Rptr.3d 741].)

A

*Torture*

■ A person is guilty of torture if he "inflicts great bodily injury" "with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (§ 206.) Defendant argues there was insufficient evidence he acted with the requisite intent here because his acts were not sufficiently "brutal." We disagree.

"Courts have interpreted intent to inflict 'cruel' pain and suffering as intent to inflict extreme or severe pain." (*People v. Burton* (2006) 143 Cal.App.4th 447, 452 [49 Cal.Rptr.3d 334].) Thus, the question here is whether there was substantial evidence that defendant intended to inflict extreme or severe pain on S.

"Absent direct evidence of such intent, the circumstances of the offense can establish the intent to inflict extreme or severe pain." (*People v. Burton, supra,* 143 Cal.App.4th at p. 452.) For example, "a jury may infer intent to cause extreme pain from a defendant who focuses his attack on a particularly

vulnerable area, such as the face, rather than indiscriminately attacking the victim." (*Ibid.*)

Before we turn to the evidence of defendant's intent, we must address whether torture can be committed by a course of conduct. As will be seen, this issue is significant to resolution of whether there was substantial evidence that defendant had the intent required for the crime.

### 1. *Torture as a Course of Conduct Crime*

■ "[W]here violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged," either the state must " ' "select the particular act upon which it relied to make good the allegation of the information" ' " or the jury must be instructed "that they must agree unanimously on which act they based their guilty verdict." (*People v. Thompson* (1984) 160 Cal.App.3d 220, 223–224 [206 Cal.Rptr. 516].) "Neither instruction nor election are required, however, if the case falls within the continuous course of conduct exception," which arises "when the acts are so closely connected that they form part of one and the same transaction, and thus one offense" or "when . . . the statute contemplates a continuous course of conduct [or] a series of acts over a period of time." (*Id.* at p. 224.)

It is clear the torture statute, section 206, does not *require* the intent to cause or the actual causing of *prolonged* pain. (*People v. Hale* (1999) 75 Cal.App.4th 94, 108 [88 Cal.Rptr.2d 904].) But that is not the same thing as saying the prosecution is precluded from proving infliction of bodily injury or a defendant's intent to cause cruel or extreme pain by a course of conduct occurring over time.

Here, the prosecution proceeded on the theory that defendant committed the crime of torture against S. by a course of conduct between June 2003 and February 2004. Defendant argues, however, that torture is not a crime that can be committed by a course of conduct. As we will explain, defendant is mistaken.

"Decisions on the continuous course of conduct exception have focused on the statutory language in an attempt to determine whether the Legislature intended to punish individual acts or entire wrongful courses of conduct." (*People v. Salvato* (1991) 234 Cal.App.3d 872, 882 [285 Cal.Rptr. 837].) "[C]ertain verbs in the English language denote conduct which occurs instantaneously, while other verbs denote conduct which can occur either in an instant or over a period of time." (*People v. Gunn* (1987) 197 Cal.App.3d 408, 415 [242 Cal.Rptr. 834].) In the latter situation, where the statute "may

be violated by a single act" or "repetitive or continuous conduct," and the charging instrument "allege[s] a course of conduct in statutory terms which . . . occurred between two designated dates," "[t]he issue before the jury [i]s whether the accused [is] guilty of the course of conduct, not whether he . . . committed a particular act on a particular day." (*People v. Ewing* (1977) 72 Cal.App.3d 714, 717 [140 Cal.Rptr. 299].)

Here, defendant argues that the operative language of section 206—specifically, the word "inflicts"—does not denote conduct that can occur over a period of time. He contends that "[i]nfliction of injury normally occurs as the result of a violent act" and "[t]he infliction of great bodily injury is not a gradual or continuous process. It is a discrete criminal event."

 Defendant's argument is contradicted by the plain meaning of the word "inflict," which includes "to cause (something unpleasant) to be endured." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 641, col. 1.) Obviously a person can be forced to endure something unpleasant over a period of time. Indeed, anyone who has visited a chamber of horrors in a wax museum can conjure up any number of classic instruments of torture—such as the rack—that are specifically *designed* to inflict pain and injury over an extended period of time.

Defendant's argument is also contradicted by case law applying the continuous course of conduct exception to other criminal statutes that penalize the "infliction" of pain or injury. For example, child abuse may be committed by "willfully caus[ing] or permit[ting] any child to suffer, or *inflict[ing]* thereon unjustifiable physical pain or mental suffering." (§ 273a, italics added.) In *People v. Ewing*, this court held that "[a]lthough the child abuse statute may be violated by a single act [citation], more commonly it covers repetitive or continuous conduct." (*People v. Ewing, supra*, 72 Cal.App.3d at p. 717.) Similarly, the crime of spousal abuse (also, spousal battering or infliction of corporal injury on a spouse) is committed by "willfully *inflict[ing]* upon a . . . spouse . . . corporal injury resulting in a traumatic condition." (§ 273.5, subd. (a), italics added.) In *People v. Thompson*, the appellate court followed *Ewing* in holding that the spousal abuse statute, like the child abuse statute, is "aimed at repetitious activity which culminates in prohibited conduct." (*People v. Thompson, supra*, 160 Cal.App.3d at p. 225; see also *People v. Sanchez* (2001) 94 Cal.App.4th 622, 632–633 [114 Cal.Rptr.2d 437] [the crime of animal abuse, which includes " 'inflict[ing] unnecessary cruelty upon [an] animal,' " can be committed by a course of conduct].)

Defendant contends a comparison of the torture statute with the spousal abuse statute is "inapt because the spousal abuse statute requires a continuing

domestic relationship between the parties, whereas the torture statute does not." Defendant is wrong. The spousal abuse statute does *not* require "a continuing domestic relationship" between the perpetrator and the victim because while the statute applies where the victim is a "spouse" or "cohabitant" of the perpetrator, it also applies where the victim is a "former spouse" or "former cohabitant"—i.e., where there is no longer a domestic relationship between the parties.

In any event, the nature of the relationship between the perpetrator and the victim is not the reason spousal abuse can be committed by a course of conduct. The reason spousal abuse can be committed by a course of conduct is because the infliction of corporal injury resulting in a traumatic condition can, as a matter of simple reason, occur either as the result of a single act or as the result of a series of acts.

Just as child, spousal, and animal abuse can be committed by a course of conduct rather than a single act, so can torture. In *People v. Salvato, supra,* 234 Cal.App.3d 872, the court held that the crime defined by section 136.1 (dissuasion of a witness) set forth a course of conduct crime because the statute "focuses on an unlawful goal or effect . . . rather than on any particular action taken to produce that end. . . . The gravamen of the offense is the cumulative outcome of any number of acts, any one of which alone might not be criminal. Thus it falls within the continuous conduct exception . . . ." (*People v. Salvato, supra,* 234 Cal.App.3d at p. 883.) The same goes for the torture statute. For torture, the "unlawful goal or effect" is the infliction of great bodily injury with the intent to cause severe pain for the purpose of revenge, extortion, persuasion, or for any sadistic purpose. Where (as here) torture is charged and tried as a course of conduct crime, no single act in the perpetrator's course of conduct may result in great bodily injury. But where the cumulative result of the course of conduct is great bodily injury, and the requisite intent can be found, then the crime of torture has been committed under the course of conduct exception to the election/unanimity requirement.

## 2. *Intent to Cause Severe Pain*

With the understanding that torture can be a course of conduct crime, we turn back to whether there was substantial evidence that when defendant inflicted great bodily injury on S., he did so with the intent to cause her severe pain.

As we have noted, the intent to cause severe pain need not be proven by direct evidence, but can be inferred from the circumstances of the offense, such as a focused attack on a particularly vulnerable area. (*People v. Burton,*

*supra,* 143 Cal.App.4th at p. 452.) Here, in explaining why she did not seek medical treatment for the injuries defendant inflicted on her, S. testified she "wasn't allowed to" because if she "acted like [she] was hurt, [defendant] would kick [her] again or hit [her] where he had just hurt [her] before. He targeted already broken bones and swollen bruises." As an example, S. had earlier testified about the incident when she and defendant were coming inside from the garage. Defendant "started hitting [her] and threw [her] into the trash cans and onto the floor and kicked [her]." She jumped up and tried to pretend she was not hurt, but was unconsciously holding her wrist up because it was throbbing. When defendant saw that she was favoring her wrist, he picked up a metal pipe and hit her "on the part of [her] arm that was starting to swell." S. also testified that on another occasion defendant "hit [her] in the ribs which were already sore from a few nights before that."

 We believe a jury could reasonably determine that a person who deliberately strikes his victim on an area of the body that is already injured has the intent to cause severe pain—or, as defendant puts it, "a level of pain over and above the level of pain that a victim would suffer in an ordinary assault or battery."

Defendant contends S.'s "generic claim that he would hit her in sore ribs and target already broken bones" will not support his torture conviction because "there was no evidence that he knew that she had sore ribs and already broken bones when he did these generic acts." Later, he complains that the People "do[] not cite substantial evidence to show that [he] had that knowledge."

Defendant's argument misapprehends the burden imposed on a defendant who challenges the sufficiency of the evidence. It is not enough for defendant to simply say "there was no evidence"; instead, "he must *affirmatively demonstrate* that the evidence is insufficient" on the point in dispute. (*People v. Sanghera, supra,* 139 Cal.App.4th at p. 1573.) For the same reason, defendant's complaint that the People have not cited substantial evidence misses the point. The People do not bear the burden of showing the conviction is supported by substantial evidence; instead, because "we *must* begin with the presumption that the evidence . . . *was* sufficient," it is defendant, as the appellant, who "bears the burden of convincing us otherwise." (*Ibid.*)

The question here is whether there was sufficient evidence that defendant knew he was striking S. where she was already injured when he "targeted already broken bones and swollen bruises." Defendant has not carried his burden of showing there was no such evidence. In any event, the incident in the garage supplies one example of such evidence, because the jury could

have found based on S.'s testimony regarding that incident that defendant knew her arm was injured when he struck her there with a metal pipe. Indeed, we believe the jury could have reasonably inferred more generally from the evidence, including (but not limited to) the evidence regarding the frequency of defendant's physical assaults on S., that he knew where he had struck her recently and therefore knew where he could strike her again to cause her greater pain.

Defendant argues, however, that to convict him of torture, the jury had to find not only that he acted with the intent to cause extreme pain, but that the action he undertook with that intent was one that in fact caused great bodily injury. Thus, he contends, "[i]f S. claimed that [he] struck her on the arm because he saw that she was favoring it, that would not be torture unless there was concomitant proof that the blow resulted in great bodily injury." By inference, defendant suggests there was no such proof here.

■ It is with regard to this argument that the nature of the crime of torture as one that can be committed by a course of conduct becomes significant. Defendant's argument presumes that each act of violence he committed on S. must be analyzed separately to determine if there was evidence that particular act was committed with the intent to cause severe pain *and* evidence that particular act resulted in great bodily injury. This is incorrect. Where, as here, torture is charged and tried as a course of conduct crime, such analysis is unnecessary. The question for the jury was not whether S. suffered great bodily injury from a particular act defendant committed on a particular day with the intent to cause her severe pain. Rather, the question was whether, with that intent, defendant engaged in a course of conduct toward S. that resulted in great bodily injury. As long as the jury could reasonably find that defendant had the requisite intent when he engaged in the course of conduct, and that the course of conduct resulted in great bodily injury, then the evidence is sufficient to support a torture conviction.

■ Here, S.'s testimony was sufficient to support the reasonable inference that during his course of physical assaults on her, defendant intentionally targeted areas of her body where he had injured her already and thus acted with the intent to cause her severe pain. This was enough to support a finding that defendant had the intent required for the crime of torture.

## B

### *Criminal Threat*

■ A person is guilty of making a criminal threat if he "willfully threatens to commit a crime which will result in death or great bodily injury

to another person, with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety." (§ 422.)

The criminal threat charge of which defendant was convicted was based on the tape recording he made in February 2004. S. testified that defendant wanted to record her confessing that she had molested their children. He turned on the tape recorder and sat with a gun in his lap as he questioned her. During the recording session, defendant found a piece of paper on which Lisa Clum had written the name of a Christian counseling center three months earlier. The piece of paper was actually an appointment reminder for an orthodontic appointment for Lisa's daughter, Ashley. Upon defendant's discovery of the reminder slip, the following exchange occurred (according to the transcript of the recording):

"Richard: [W]hat is it, what is this, Ashley? What is it? What is this? What is this? What is it?

"[S.]: I don't know. I want to know as much as you do. I honestly do not know.

"Richard: [B]elieve . . . .

"[S.]: I do not know.

"Richard: Oh, but you're [sic] know lots of other things, so you just start answering these fucking questions.

"[S.]: Okay. I want to. Ask me, please.

"Richard: (Yelling) You (Inaudible) shit. Raw shit. (Inaudible) time you leave me. With your fucking whore fake pastor, what, did you fuck her? Yeah. Get indoctrinated into the church? You better fucking come clean.

"[S.]: I (Inaudible)

"Richard: I wouldn't (Inaudible) up, [S.]. Because I'll kill you now if you (Inaudible). You're not escaping this one. And you give me information you just start talking. Get going."

Defendant contends that, because his threat to kill S. was conditional ("I'll kill you now if you") but due to the inaudible portion of the tape "the condition was never established," the evidence was insufficient to support his conviction of making a criminal threat. We disagree.

"To constitute a criminal threat, a communication need not be *absolutely* unequivocal, unconditional, immediate, and specific. The statute includes the qualifier 'so' unequivocal, etc., which establishes that the test is whether, in light of the surrounding circumstances, the communication was *sufficiently* unequivocal, unconditional, immediate, and specific as to convey to the victim a gravity of purpose and immediate prospect of execution." (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 861 [123 Cal.Rptr.2d 193].) "[W]hether the words were sufficiently unequivocal, unconditional, immediate and specific they conveyed to the victim an . . . immediate prospect of execution of the threat can be based on all the surrounding circumstances and not just on the words alone." (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1340 [69 Cal.Rptr.2d 728].) "[I]t is the circumstances under which the threat is made that give meaning to the actual words used. Even an ambiguous statement may be a basis for a violation of section 422." (*People v. Butler* (2000) 85 Cal.App.4th 745, 753 [102 Cal.Rptr.2d 269].) The jury is "free to interpret the words spoken from all of the surrounding circumstances of the case." (*Mendoza*, at p. 1341.)

Here, in arguing the evidence is insufficient to show his threat conveyed the requisite "gravity of purpose and immediate prospect of execution," defendant ignores all of the surrounding circumstances and bases his argument on the words of the threat alone—or, more accurately, on the words that are *missing* from the recording of the threat due to the inaudible portion of the recording. But, as we have seen, the law does not permit such a myopic examination of the evidence. Rather, we must look to *all* of the surrounding circumstances, including the words that *were* recorded, to determine if the jury could have reasonably found that the threat carried the requisite gravity of purpose and immediate prospect of execution, despite the inaudible portion of the tape following the word "if."

We conclude the evidence was sufficient for this purpose. Although the recording does not reveal exactly what condition defendant placed on his threat, from the context and surrounding circumstances the jury reasonably could have determined that defendant essentially threatened to kill S. if she did not cooperate and answer his questions about the slip of paper he had found. Indeed, virtually everything defendant said immediately before and after his threat supports such a determination. Before his threat, he demanded that she "just start answering these fucking questions" and that she "better fucking come clean." Immediately after the threat, he told her she was "not

escaping this one" and told her to "give [him] information," "just start talking," and "[g]et going." Under these circumstances, the jury did not need to know the exact words of the condition defendant placed on the threat to conclude that the threat was so unconditional as to convey a gravity of purpose and an immediate prospect of execution. Accordingly, defendant's sufficiency of the evidence challenge to his conviction of making a criminal threats fails.

## II

### Misdemeanor Child Abuse Convictions

██ A person is guilty of misdemeanor child abuse if (among other things), he "willfully causes or permits any child to suffer, or inflicts thereon unjustifiable . . . mental suffering" "under circumstances or conditions other than those likely to produce great bodily harm or death." (§ 273a, subd. (b).) If the abuse occurs "under circumstances or conditions likely to produce great bodily harm or death," then the crime is a felony. (§ 273a, subd. (a).)

Here, defendant contends his misdemeanor child abuse convictions must be reversed because they were barred by the one-year statute of limitations. In the alternative, he contends the convictions must be reversed "[b]ecause the prosecutor's theory intruded upon the fundamental constitutional rights of parenting and of free expression." We disagree on both points.

### A

### Procedural Background

A criminal complaint was originally filed against defendant on March 2, 2004, in case No. P04CRF0132 (the 2004 case). The complaint did not contain any child abuse charges.

On May 27, 2004, an amended complaint was filed in the 2004 case. The amended complaint included three charges of felony child abuse alleged to have occurred between February 1, 2004, and February 22, 2004. Each child abuse charge in the amended complaint broadly alleged that defendant "did willfully and unlawfully, under circumstances likely to produce great bodily harm and death, did cause and permit a child . . . to suffer unjustifiable physical pain or mental suffering or to be placed in such situation that his/her person and health may be endangered."

On June 10, 2004, defendant waived his right to a preliminary hearing, and on June 21 an information was filed containing the same three child abuse charges as the amended complaint.

In January 2005, defendant filed a motion seeking to force the prosecution to elect the acts on which various charges in the information—including all three child abuse charges—were based. In response to that motion, the prosecution informed defendant an election was impossible because the child abuse charges were based on a continuing course of conduct. At the hearing on the motion, defendant argued that the child abuse charges were apparently based on "the prosecution theory . . . that . . . there was violence to [the children's] mother and that it was in or about their presence." When the court pointed out that "each count [was] alleged to have occurred between February 1st and February 22nd of 2004" "[s]o you are on notice in that regard," defendant complained that he "didn't know what incident—what claimed incident that they are going to be relying on." The prosecutor responded, "And the People's answer is it is a continuing course of conduct during that time frame. It is our contention that the defendant beat his wife in the presence of his children four out of seven days a week, five out of seven days a week. [¶] We have statements from the children as to witnessing these acts of violence and seeing the injuries on their mother. . . . [¶] We have statements of the victim of those acts herself who says that they occurred in the presence of her children . . . ." The prosecutor later added "that the People's theory is one of mental suffering caused in the children by the environment that they were subjected to by the defendant's continuous abuse and beating and, essentially, torture of their mother in their presence." The court concluded "sufficient notice ha[d] been given" because "[w]e have the specific time period, the specific theory of mental suffering. [¶] We know by established law that any—if the children witnessed any physical harm, threats, injuries between the parents, that that is sufficient to violate those code sections."

Trial was eventually set for April 26, 2005. At the readiness conference on April 1, 2005, defendant asked for a continuance. Trial was reset for May 24.

Meanwhile, in mid-April, the prosecutor sought an indictment from the grand jury. Before the grand jury, R. testified that he saw and heard defendant hit S. and that these incidents occurred with increasing frequency in the three or four months before February 2004. He also testified that defendant told him his grandfather was the head of a demonic cult, that the cult was trying to kill defendant, that his grandfather had molested S. and the children, and that S. had molested the children also.

A. testified similarly about seeing defendant strike S. and about what defendant told him.

C. testified that although she never saw defendant hit or kick S., she heard them fighting, heard S. say that she did not want defendant to hit her, and

saw S.'s injuries. C. also testified that defendant told her S. was molested by her father and that S. molested the children.

On April 15, 2005, the grand jury presented an indictment against defendant, which was assigned case No. P05CRF0161 (the 2005 case). As relevant here, the child abuse charges in the indictment were identical to those in the information in the 2004 case—one for each of the three children[2]—with the exception that the indictment alleged that the child abuse occurred between November 1, 2003, and February 26, 2004.

Defendant was arraigned on the indictment that same day and pled not guilty. When defense counsel asked if the 2004 case was dismissed, the prosecutor objected to a dismissal, asserting that she wanted the indictment to supersede the charging instrument in the earlier case. The court declined to decide the issue, leaving it open for further argument or briefing later.

On April 27, 2005, defendant filed another motion to continue the trial, which was granted. Trial was reset to October.

On July 22, 2005, defendant filed a motion to dismiss the information in the 2004 case, asserting dismissal was required because of the filing of the indictment in the 2005 case. In defendant's view, "An Information and indictment cannot logically exist at the same time." The People opposed the motion, asserting that "[a]n indictment may supersede a pending Complaint or Information."

Defendant's motion to dismiss the information was heard on August 19, 2005. The trial court apparently concluded that "the Indictment does supersede the Information or Complaint as long as the basic facts are the same."[3] A handwritten note on the indictment that appears to be dated October 18, 2005 (the fourth day of trial, during jury selection), states that the indictment "Supercedes Information case #P04CRF0132."

On December 16, 2005, following the close of evidence, the parties and the court discussed jury instructions. Defendant argued that the child abuse charges were "spread out from 11/1 to 2/26" and "[w]e don't know what the particular act has been on this. And we'd like some—I think that we should have had clarification on this." The prosecutor explained that she was going to request the jury be instructed with those portions of the felony child abuse

---

[2] No charge was filed with respect to the fourth child.

[3] This language, which we believe is attributable to the trial court, appears in the minute orders from the hearing (one in each case). No transcript of that hearing was included in the record on appeal.

instruction (CALJIC No. 9.37) that refer to a person who willfully inflicts unjustifiable mental suffering on a child or willfully causes a child such suffering.

For tactical reasons, defendant asked the trial court not to instruct the jury on misdemeanor child abuse as a lesser included offense of felony child abuse, but the court concluded it had to instruct on the misdemeanor.

In instructing on felony child abuse, the trial court instructed the jury that "[e]very person who, under circumstances or conditions likely to produce great bodily harm or death, willfully inflicts unjustifiable mental suffering on a child, or willfully causes or permits a child to suffer unjustifiable mental suffering, is guilty of a violation of Penal Code Section 273a(a)." Later, however, in instructing the jury on the elements of the crime, the court omitted the word "permits" and instructed the jury that "[i]n order to prove this crime, each of the following elements must be proved: [¶] One, a person willfully inflicted unjustifiable mental suffering on a child. [¶] Or, two, a person willfully caused a child to suffer unjustifiable mental suffering. [¶] And, three, the person's conduct occurred under circumstances likely to produce great bodily harm or death."

With regard to the mental element of the crime, the court instructed the jury that "there must exist a union or joint operation of act or conduct and general criminal intent." The jury was not instructed on criminal negligence with relation to this crime.[4]

The court's instructions on misdemeanor child abuse paralleled its instructions on felony child abuse, except for the obvious omission of the "circumstances" that turn the misdemeanor into a felony.[5]

The jury acquitted defendant on the felony child abuse charges but found him guilty of the lesser included misdemeanors.

## B

### Statute of Limitations

With this background, we turn to defendant's argument—which he raises for the first time on appeal—that his convictions for misdemeanor child abuse must be reversed because they were "facially time-barred."

---

[4] The jury was later instructed on gross negligence, but this instruction related specifically to the charge of discharging a firearm. At that time, the court reiterated that with respect to the child abuse charges (and various other charges), "there must exist a union or joint operation of act or conduct and general criminal intent."

[5] Also, the court did not mention the word "permits" in instructing on the misdemeanor.

█ With exceptions not applicable here, the prosecution for a misdemeanor must be commenced within one year after commission of the offense. (§ 802, subd. (a).) This limitation period applies to a misdemeanor that is a lesser included offense of a charged felony. (§ 805, subd. (b) ["The limitation of time applicable to an offense that is necessarily included within a greater offense is the limitation of time applicable to the lesser included offense, regardless of the limitation of time applicable to the greater offense"].)

"[P]rosecution for an offense is commenced when any of the following occurs: [¶] (a) An indictment or information is filed. [¶] (b) A complaint is filed charging a misdemeanor or infraction. [¶] (c) The defendant is arraigned on a complaint that charges the defendant with a felony. [¶] (d) An arrest warrant or bench warrant is issued, provided the warrant names or describes the defendant with the same degree of particularity required for an indictment, information, or complaint." (§ 804.)

Defendant's statute of limitations argument rests on the premise that his prosecution on the lesser included misdemeanor child abuse charges of which he was convicted began on April 15, 2005, when the indictment was filed against him. We agree, because "multiple prosecutions for the same acts are distinct." (*People v. Le* (2000) 82 Cal.App.4th 1352, 1358 [98 Cal.Rptr.2d 874].) Thus, when the indictment was filed on April 15, 2005, in the 2005 case, that filing commenced a different prosecution than the prosecution in the 2004 case.

But the fact that the prosecution in the 2005 case did not commence until April 15, 2005, more than a year after the child abuse ended, is not dispositive of whether the prosecution on the misdemeanor charges was time-barred. This is so because "[n]o time during which prosecution of the same person for the same conduct is pending in a court of this state is a part of a limitation of time prescribed in this chapter." (§ 803, subd. (b).) Thus, if the child abuse charges in the 2004 case were based on the "same conduct" as the child abuse charges in the 2005 case, then the prosecution in the 2005 case was timely because the entire period of the earlier prosecution would not count toward the one-year limitation period.

Defendant contends that for the People to claim the benefit of the tolling provision in section 803, they had to plead and prove that the child abuse charges in the 2004 case were based on the "same conduct" as the child abuse charges in the 2005 case, which they did not do; accordingly, the misdemeanor child abuse charges were barred by the statute of limitations. The People offer several arguments in response, which we will address in turn.

First, the People argue that "the issuance of a valid arrest warrant commences the prosecution and tolls the statute of limitations," and defendant "was arrested on February 28, 2004"; therefore, "the statute [of limitations] was tolled on [that date]." The People are mistaken. It is true, as we have noted, that the issuance of an arrest warrant commences the prosecution of an offense "provided the warrant names or describes the defendant with the same degree of particularity required for an indictment, information, or complaint." (§ 804, subd. (d).) Here, however, the People do not direct our attention to any evidence that any such arrest warrant was ever issued for defendant on the child abuse charges now at issue. Instead, the People refer only to the fact of defendant's arrest, which was followed by the filing of a complaint that, according to the People, contained charges that "included the conduct which later formed the basis of the child [abuse] charges." This is insufficient, however, to show that the statute of limitations was tolled on the charges of misdemeanor child abuse of which defendant was convicted in the 2005 case. Absent evidence of an arrest warrant on *those* charges that met the specificity requirements of section 804, the People's first argument fails.

The People next argue that the limitation period was "clearly tolled on May 27, 2004, when the prosecutor amended the complaint [in the 2004 case] to include the felony charges of child [abuse]." The validity of this argument depends on whether the child abuse charges in both cases were based on the "same conduct," thereby triggering the tolling provision in section 803, subdivision (b). The People acknowledge defendant's argument that they had to "plead and prove the application of [that tolling provision]," but they argue their obligation in that regard arises only if the defendant " 'puts the prosecution to its proof' " in the trial court. (Italics omitted.) The People are mistaken. The rule is this: If the People plead facts to avoid the bar of the statute of limitations, and the defendant fails to put the People to their proof in the trial court, then the defendant forfeits the statute of limitations issue and cannot raise it for the first time on appeal. (See *People v. Thomas* (2007) 146 Cal.App.4th 1278, 1287–1289 [53 Cal.Rptr.3d 473].) However, "when the charging document indicates on its face that the action is time-barred, a person convicted of a charged offense may raise the statute of limitations at any time." (*People v. Williams* (1999) 21 Cal.4th 335, 341 [87 Cal.Rptr.2d 412, 981 P.2d 42].) Here, the indictment filed in April 2005 did not contain any allegations of facts tolling the statute of limitations on the lesser included offenses of misdemeanor child abuse of which defendant was ultimately convicted. Therefore, the charging document showed on its face that the charges were time-barred, and defendant did not forfeit his statute of limitations argument by failing to put the People to their proof in the trial court.

When the charging document shows on its face that the charges were time-barred and the appellate court "cannot determine from the available record whether the action is barred, . . . it should remand for a hearing."

(*People v. Williams, supra,* 21 Cal.4th at p. 341.) Here, the People argue the record clearly shows the action was *not* barred because the record shows the prosecution for child abuse in the 2004 case was based on the "same conduct" as the prosecution for child abuse in the 2005 case. We agree.

It is important to recall that after the indictment was filed in the 2005 case, the trial court denied defendant's request to dismiss the information in the 2004 case and instead ruled that the indictment superseded the information. In doing so, the trial court effectively treated the indictment as an amendment of the prior pleading, rather than as an entirely new pleading. As the People point out, this means "the grand jury indictment was not a new action, but rather a continuation of the previous action," particularly since "the charges were identical, consistently named the same victims, and always encompassed the time period of the month of February in 2004."

Defendant nevertheless contends that "[b]ecause [he] was held to answer upon waiver of preliminary hearing, the record does not show a factual basis for these events" on which the 2004 case was based. He contends that "[w]ithout a factual basis, there is no way to determine whether the prior charges involved the 'same conduct' as the child endangerment charges alleged in the indictment."

We reject defendant's suggestion that only evidence from a preliminary hearing could show the conduct on which the child abuse charges in the 2004 case were based. On the record before us, the People's response to defendant's motion seeking to force the People to make an election on the child abuse charges in the 2004 case shows just as clearly as any transcript from a preliminary hearing could (if not more so) the conduct on which the People based those charges. As we have explained, in asserting she did not have to make an election, the prosecutor expressly told defendant and the court that the charges were based on "a continuing course of conduct" that consisted of "defendant's continuous abuse and beating and, essentially, torture of the[ children's] mother in their presence" between February 1, 2004, and February 22, 2004.

The question for us is whether this conduct was the "same conduct" as the conduct on which the child abuse charges in the 2005 case were based. Two factors complicate the analysis of that question. First, although she elicited evidence the children had seen and/or heard defendant physically abusing S., in closing argument the prosecutor emphasized the mental suffering defendant inflicted on the children by telling them "[s]omething so horrific that children just don't have any business knowing." Second, and more importantly, the jurors were not instructed on the legal principles that would have allowed

them to convict defendant of indirect child abuse based on their seeing and/or hearing defendant's physical abuse of S. Instead, they were instructed only on the theory of direct abuse.

 "Section 273a encompasses a wide variety of situations and includes both direct and indirect conduct. [Citations.] When the harm to a child is directly inflicted, the requisite mental state for the section 273a offense is general criminal intent. [Citation.] When that harm is indirectly inflicted, the requisite mental state is criminal negligence." (*People v. Burton, supra,* 143 Cal.App.4th at p. 454.) When a charge of child abuse is based on the mental suffering resulting from a child being exposed to physical abuse by one parent against the other, the theory at issue is *indirect* child abuse, for which criminal negligence is the requisite mental state. (See *id.* at pp. 450–451, 454–455 [indirect child abuse at issue where physical attack on child's mother occurred in child's presence].)

As we have noted, the jury here was not instructed on criminal negligence in connection with the child abuse charges against defendant. Rather, the jury was instructed only on general criminal intent. Thus, the question here is this: Given that defendant was convicted of child abuse on a theory of direct abuse based on the things he told the children that caused them mental suffering, were the child abuse charges in the indictment nevertheless based on the "same conduct" as the child abuse charges in the superseded information, which the prosecutor said were based on indirect abuse defendant inflicted on the children by physically abusing their mother in their presence?

Defendant does not address this question, but we conclude the answer is "yes." The drafters of the pertinent statute observed that " '[t]he test of the "same conduct," involving as it does some flexibility of definition, states a principle that should meet the reasonable needs of prosecution, while affording the defendant fair protection against an enlargement of the charges after running of the statute.' " (*People v. Bell* (1996) 45 Cal.App.4th 1030, 1064 [53 Cal.Rptr.2d 156].) Applying that "flexibility of definition," the appellate court in *Bell* determined that charges of forgery and false filings of petitions for bankruptcy or grant deeds were based on the "same conduct" as rent skimming charges where "the forgery and false filings were merely aspects of [the] rent skimming scheme." (*Id.* at pp. 1039, 1064.) Similarly, in *People v. Greenberger* (1997) 58 Cal.App.4th 298 [68 Cal.Rptr.2d 61], the appellate court determined that kidnapping and murder charges were based on the "same conduct" where "the facts . . . clearly establish[ed] that the kidnapping was part of the same conduct that resulted in [the] murder." (*Id.* at p. 369.)

Given the "flexibility of definition" in the phrase "the same conduct," we conclude the child abuse charges in the 2005 case were based on the same

conduct as the child abuse charges in the 2004 case, notwithstanding the change in theory from direct child abuse to indirect child abuse. The victims were the same, the indictment covered the entire period previously covered by the information, and the trial court determined that the indictment superseded the information. Moreover, unlike in either *Bell* or *Greenberger*, the same criminal charges (child abuse) were alleged in both the information and the indictment. This is not a case involving "completely separate instances of criminal conduct," where the tolling provision in section 803, subdivision (b) does not apply. (*People v. Terry* (2005) 127 Cal.App.4th 750, 769 [26 Cal.Rptr.3d 71].)

Because the child abuse charges in both cases were based on the same conduct, the prosecution of the 2004 case tolled the statute of limitations on the misdemeanor child abuse charges of which defendant was convicted. Therefore, those charges were not time-barred.

## C

### *Infringement of Defendant's Constitutional Rights*

Defendant's alternate challenge to his convictions for misdemeanor child abuse rests on the prosecution's theory of direct abuse. Defendant contends that "the People elected to prosecute [him for child abuse] on the narrow theory that he . . . inflict[ed] unjustifiable mental suffering on his children by telling them upsetting stories." He further contends that "[b]ecause the prosecutor's theory intruded upon the fundamental constitutional rights of parenting and of free expression, the attempt to criminalize parental storytelling must fail, and the three convictions for misdemeanor child [abuse] must be reversed."

The People dispute the initial premise of defendant's argument, asserting that the child abuse charges were based not only on what defendant *told* the children, but also on his conduct, including (but not limited to) "the act of firing a gun in the vicinity of the children and . . . leaving his unsecured weapons around the house in areas easily accessible to the children."

Defendant contends the child abuse charges could not have been based on this conduct, which was not directed at the children, because any such conduct would have amounted to only *indirect* child abuse, not *direct* child abuse, and the jury was not instructed on indirect child abuse because no instruction on criminal negligence—one of the elements of indirect child abuse—was given.

■ Although defendant is correct on this initial point, we conclude his argument ultimately fails because a parent does *not* have a constitutional right

to willfully inflict unjustifiable mental suffering on his children, even if the instrument of this suffering is "parental storytelling."

■■■ "[W]hen a defendant raises a plausible First Amendment defense" to a criminal charge, "a reviewing court should make an independent examination of the record . . . to ensure that [the defendant's] free speech rights have not been infringed by [the] trier of fact's determination that the communication at issue constitutes a [crime]." (*In re George T.* (2004) 33 Cal.4th 620, 632 [16 Cal.Rptr.3d 61, 93 P.3d 1007].) Here, even assuming defendant's constitutional defense is "plausible," we find no infringement of his constitutional rights by his child abuse convictions.

Defendant contends a conviction for child abuse based on things he told his children impermissibly infringes on his "fundamental constitutional rights of parenting and of free expression." He asserts that "[w]hether or not the children had any business knowing [what he told them] is a decision to be made by parents, not by the state. The decision as to whether or not to tell children about matters affecting the family and family relationships—even if they are upsetting or disturbing or false—belongs to the parent." He further contends that because his statements to his children "were not indecent, lewd, or obscene," his speech was constitutionally protected under "his right of free expression in his home."

We are not persuaded. By his own admission, the evidence showed that defendant told his children that:

(1) their grandfather was a child molester who molested their mother (S.) throughout her childhood;

(2) their grandfather was the leader of a satanic cult that was plotting to kill him (defendant) and either abduct or kill the children; and

(3) their grandfather and their mother had molested them.

Moreover, defendant does not deny that the evidence before the jury would have allowed the jury to reasonably conclude that these things he told the children were *false*. Thus, given the nature of defendant's convictions, he is essentially arguing that he had a constitutional right to willfully inflict unjustifiable mental suffering on his children by falsely telling them that their mother and grandfather were both child molesters, that they themselves had been molested by their mother, and that their grandfather was the leader of a satanic cult that was plotting to kill their father and kidnap or kill the children. None of the cases he cites, however, comes close to supporting this proposition.

In *Emery v. Emery* (1955) 45 Cal.2d 421 [289 P.2d 218], in the course of explaining why "an unemancipated minor may sue his parent for a wilful or malicious tort," our Supreme Court stated that "[s]ince the law imposes on the parent a duty to rear and discipline his child and confers the right to prescribe a course of reasonable conduct for its development, the parent has a wide discretion in the performance of his parental functions, but that discretion does not include the right wilfully to inflict personal injuries beyond the limits of reasonable parental discipline. No sound public policy would be subserved by extending it beyond those limits. While it may seem repugnant to allow a minor to sue his parent, we think it more repugnant to leave a minor child without redress for the damage he has suffered by reason of his parent's wilful or malicious misconduct. A child, like every other individual, has a right to freedom from such injury." (*Id.* at pp. 429–430.)

Although *Emery* did not involve criminal charges or the constitutional rights defendant asserts here, we nonetheless find its language persuasive on the issues before us—particularly in the absence of any persuasive authority from defendant. A child's right to freedom from injury caused by his or her parent's willful misconduct extends to freedom from unjustifiable mental suffering, even when that suffering results only from things the parent says to the child. "[A] state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." (*Parham v. J. R.* (1979) 442 U.S. 584, 603 [61 L.Ed.2d 101, 119, 99 S.Ct. 2493].) Under the circumstances of this case, we conclude defendant's constitutional rights were not unduly infringed by his child abuse convictions.

### III

### *Evidentiary Errors*

### A

### *Denial of Motion to Strike*

On cross-examination, to establish bias, defense counsel elicited from A. the fact that A. was angry with defendant. On one occasion, defense counsel asked A., "What caused that anger?" and A. responded, "I started thinking about the times that he'd abused my mom." Later, defense counsel elicited from A. that "[f]iguring out [defendant] was a bad guy made [A.] angry at [defendant]." Defense counsel then asked A. whether he testified about various incidents because he was angry with defendant, and counsel asked A. to confirm that he was "angry with [defendant] because [A.] saw him hit

[A.'s] mom." A. responded, "One of the reasons, yes." Defense counsel then asked, "You think he let you down because you don't think what he was telling you about [the] molest is true, do you?" A. responded, "I don't know. Um, I think he let me down for a lot of other reasons."

Defense counsel did not follow up on what these "other reasons" were, but the prosecutor did. On redirect examination, the prosecutor asked, "Why do you think your dad let you down?" A. responded, "Because he's abused my mom, he's abused me. He's emotionally and mentally abused my siblings. [¶] Let's see. All the pornography that he had, after him telling us that pornography is bad. [¶] He told us never to smoke, he smoked." At this point, defense counsel objected "for lack of foundation, 352" and moved to strike the testimony. The court invited counsel to approach, and outside the hearing of the jury a discussion ensued over the relevance and admissibility of A.'s reasons for feeling that defendant let him down. Defendant asked the court "to strike that last portion about pornography" and defense counsel asked the court "to instruct the jury to disregard everything after . . . my mother abused me."[6] The court refused these requests, noting that "[o]ne way or another you opened up that he believes his dad let him down" and therefore the prosecutor could "ask him what the other reasons are."

On appeal, defendant contends the trial court erred in denying his motion to strike A.'s testimony because, as stated in *People v. Zemavasky* (1942) 20 Cal.2d 56 [123 P.2d 478], "it is an unquestioned rule of evidence that when any witness admits bias and prejudice on cross-examination, on redirect the reasons for such prejudice cannot be gone into, at least where such reasons involve other alleged offenses outside the issue." (*Id.* at p. 63.)

The People contend defendant's argument "overlooks" that A.'s "general reference to pornography did not involve illegal conduct." In reply, defendant asserts that the rule "is not limited to evidence of prior criminal conduct," but all of the cases he cites did, in fact, involve such conduct. (See *People v. Zemavasky, supra*, 20 Cal.2d at p. 63 [redirect examination elicited that the witness saw the defendant "in the court charged with omitting to provide for three minor illegitimate children"]; *People v. Pierce* (1969) 269 Cal.App.2d 193, 205 [75 Cal.Rptr. 257] [redirect examination elicited that "defendant had almost killed [the witness's] mother on other occasions by beating her until she was unable to stand"]; *People v. Morris* (1988) 46 Cal.3d 1, 38–39 [249 Cal.Rptr. 119, 756 P.2d 843] [redirect examination elicited evidence of a "prior homicide"].)

In any event, even if we assume the trial court abused its discretion in refusing to strike A.'s testimony about defendant possessing pornography (see

---

[6] Counsel apparently meant to refer to A.'s statements that *defendant* abused him.

*People v. Pierce, supra*, 269 Cal.App.2d at p. 205 ["Under the Evidence Code the rule is [properly] addressed to the trial court's discretion."]), defendant has failed to make the requisite showing of prejudice.

Error in the admission of evidence warrants reversal only if it is reasonably probable a result more favorable to the appellant would have been reached in the absence of the error. (*People v. Mullens* (2004) 119 Cal.App.4th 648, 658–659 [14 Cal.Rptr.3d 534].) Here, defendant makes no effort to persuade us that it is reasonably probable he would have obtained a better result if A.'s testimony about him possessing pornography had been stricken. Defendant briefly asserts that "[i]n a close credibility contest, errors that tip the balance against the defendant in the assessment of credibility are not harmless," but he fails to explain how A.'s isolated reference to his possession of pornography, particularly in a trial in which the testimony stretched over 19 days, could have "tip[ped] the balance against [him] in the assessment of credibility."[7] Absent a persuasive showing that the alleged error was prejudicial, we must conclude it was not.

B

*Exclusion of Handwriting Expert*

S. testified that defendant's story about the molestation "changed on a daily basis" and that to keep up with the changes she would make notes. At one point, she said that defendant "would dictate and make me write notes as he was reading through these books."

During defendant's case, the prosecutor told the court outside the presence of the jury that she was going to challenge an expert witness defendant intended to call to testify that S.'s writings did not show any signs of stress or duress.[8] After hearing initial arguments on the matter, the court decided it would hold an Evidence Code section 402 hearing on the admissibility of the testimony.

At that hearing, Marcel Matley testified that he had been an examiner of documents and handwriting since 1985. Matley testified that his experience embraced "[a]lmost every aspect of document examination," including whether the writing "show[s] influence of something that was happening at the time it was writ[ten]." Matley testified that while he had qualified as an

---

[7] In fact, the sentence that follows in defendant's opening brief is lifted in its entirety from another section of the brief dealing with a different subject altogether (S.'s testimony and the absence of an accomplice instruction).

[8] We will occasionally refer to this subject as handwriting stress analysis.

expert witness "either 71 or 72 times in courts of law," he had qualified only once as an expert on handwriting stress analysis, although he had testified on that issue in at least three other cases.

In explaining the theory behind handwriting stress analysis, Matley said that while some people are not affected by threats, others feel threatened, and the resulting stress manifests itself in the tightening of muscles, which can inhibit the person's writing. This can result in slower writing with heavier pressure and less continuity. The letters and the spaces between them become narrower, and the spaces between lines (on unlined paper) might become narrower also.

To determine whether a particular writing shows signs of being written under stress, Matley compares it to other writings by the same person. If all the writings appear the same, then it may simply be the person's "habit to write stressfully." Matley explained that in doing his analysis, "ideally [he] ha[s] a set of writings that everyone agrees are normal."

At the conclusion of his direct examination of Matley, defendant offered an exhibit that contained three documents[9] written by S. that Matley had examined for signs of stress. Matley later explained that he had been told it was disputed as to whether the three documents were written under stress, in other words, there was no agreed-upon "normal" writing sample.

Matley admitted that if a person was chronically under stress, it would be "beyond the expertise of a forensic handwriting examiner" to determine whether a particular writing was written under stress or duress because "it is something chronic, habitual; it is not an acute thing."

On examination by the court, Matley stated that because he did not have an agreed-upon normal writing sample, his opinion would address "[t]he degree of spontaneity versus stress and then a balance between the two" as to all three documents.

Following Matley's testimony, the prosecutor argued that stress analysis was "not an accepted practice or science" and "there's nothing to back it up." Defendant argued that his testimony should be allowed because Matley had compared the 15 pages of "writings that have been referenced by [S.] . . . as being written during this time period when [defendant] was allegedly forcing her to write diaries about the issue in question during that time period" with "the Lisa Taylor letter where she wanted to get out of prostitution, get out of

---

[9] Defendant later clarified that the first document was actually a set of documents consisting of 15 pages.

the cult movement, get out of the incest and was breaking away" and with "a journal" S. wrote "for Detective Strasser" "after [defendant's] arrest." According to defendant, Matley would testify that "there was no stress or duress" in the writings from the time period when he was allegedly "forcing her to write diaries," that the Lisa Taylor letter was "a normal writing," and that the journal S. wrote for Detective Strasser was "the one document that she is extremely stressed in."

In ruling on the issue, the court first expressed concern that Matley "spends 80 to 90 percent of his time I.D.'ing who the particular writer of a document was." As for handwriting stress analysis, the court was concerned that Matley had "very few cases where he's testified as an expert" and "if you don't have a known sample which you can clearly say was written under no stress or duress, I don't see how there's much validity to the conclusion." The court later explained in more detail that "unless you do have a clean sample where you can say this is a pristine example of someone who wrote a document not under stress" and all the expert can say is "this looks like it is written under more stress, this least stress," "[h]ow is that going to help the jury in the ultimate resolution?" The court then expressed concern about the validity of handwriting stress analysis as a discipline, saying, "That all does sound like hocus-pocus to me."

At defendant's request, the court allowed Matley to be recalled to the stand. Matley explained that he does not need a "clean sample" to determine whether a writing appears to have been written under stress. Instead, he asserted he could look at a writing and determine from that writing alone whether it "has the elements . . . the person's uptight while they're writing." The purpose of using a sample of "normal" writing for comparison is to see if the stress is "outside the norm." Matley then explained his conclusions about the writing samples from S. He concluded the 15 pages were "characterized by spontaneity" and he did not "find any aspects of these documents being written under stress or duress." He concluded the Lisa Taylor letter was "[n]either characterized by characteristics of stress nor by characteristics of spontaneity." Finally, he concluded that in the journal written for Detective Strasser, "the characteristics of stress dominate versus the characteristics of spontaneity." Matley admitted that he could determine whether a writing showed signs of being written under stress, but he could not determine whether duress was the cause of the stress.

In further argument on the admissibility of Matley's proposed testimony, defense counsel argued that "he's clearly within accepted expert boundaries to be able to testify that this type of writing has these characteristics showing stress," and "a comparison" showing that "[t]his particular writing was written under more stress than this one, or this one under less stress" "is still of great value to the [jury]."

The court ultimately determined that while Matley had "some expertise" in the area of handwriting stress analysis, his testimony would "not assist the jury in any material way sufficient to warrant his testimony," and consequently the court ruled Matley would not testify.

In his new trial motion, defendant argued that the court had erred in excluding Matley's testimony. In denying that aspect of defendant's motion, the court explained that "in essence, in substance, [the court] was making a[n Evidence Code section] 352 ruling in" excluding Matley's testimony. The court asserted that the probative value of Matley's proposed testimony was weak because Matley could not "say whether duress was the cause of the stress" that might have been reflected in S.'s writing, and thus his testimony about all the factors that go into determining whether someone is writing under stress would have "occup[ied] undue consumption of time and distract[ed] the jury on irrelevant issues."

On appeal, defendant contends that "[t]he court erred in refusing to permit [Matley] to testify concerning handwriting stress analysis" because his testimony "would have been relevant and highly probative." We find no error.

"In determining whether to admit expert testimony, the trial court has broad discretion, and we may not interfere with that discretion unless it is clearly abused." (*People v. Bui* (2001) 86 Cal.App.4th 1187, 1196 [103 Cal.Rptr.2d 908].) Indeed, "an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence," including a ruling under Evidence Code section 352. (*People v. Waidla* (2000) 22 Cal.4th 690, 724 [94 Cal.Rptr.2d 396, 996 P.2d 46].)

Here, as the trial court explained in ruling on defendant's new trial motion, the court excluded Matley's testimony because the court determined that whatever probative value Matley's testimony might have was outweighed by other factors cognizable under Evidence Code section 352,[10] namely, "undue consumption of time and distract[ion of] the jury on irrelevant issues." (See Evid. Code, § 352.) We find no abuse of discretion in that ruling. The trial court reasonably determined that Matley's testimony would have little probative value because while Matley could testify that certain writings by S. showed or did not show signs of having been written under stress, he could not "say whether duress was the cause of the stress." Weighed against that small probative value was the "undue consumption of time" the court concluded would be required for Matley to testify about all the factors that go into determining whether someone is writing under stress.

---

[10] "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

" '[T]he term judicial discretion "implies absence of arbitrary determination, capricious disposition or whimsical thinking." ' [Citation.] '[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered.' " (*People v. Mullens, supra,* 119 Cal.App.4th at p. 658.) Here, defendant has failed to demonstrate the court's ruling excluding Matley's testimony exceeded the bounds of reason. Accordingly, no abuse of discretion has been shown.

 As for defendant's suggestion that the trial court's ruling violated his federal constitutional rights, the following passage suffices to answer that suggestion: "Application of the ordinary rules of evidence, such as Evidence Code section 352, generally does not deprive the defendant of the opportunity to present a defense [citation]; certainly the marginal probative value of this evidence does not take it outside the general rule." (*People v. Snow* (2003) 30 Cal.4th 43, 90 [132 Cal.Rptr.2d 271, 65 P.3d 749].)

IV

*Instructional Errors*

A

*Unanimity Instruction for Torture*

Defendant contends the trial court erred in failing to give a unanimity instruction on the charge of torture. As we have explained already, however, torture can be committed by a course of conduct, and here the prosecution proceeded on the theory that defendant committed the crime of torture against S. by a course of conduct between June 2003 and February 2004. Thus, under the course of conduct exception to the election/unanimity requirement, no unanimity instruction was required.

Defendant contends that "[e]ven if a statute creates a continuous course of conduct offense, a unanimity instruction is nonetheless required if the evidence offered to prove the offense shows multiple separate and discrete criminal events." Thus, for example, in *People v. Sanchez, supra,* 94 Cal.App.4th 622, a unanimity instruction was required on a charge of animal abuse where that charge was based on "evidence of two separate incidents in which [the] defendant kicked a dog during the period of time charged in the information." (*Id.* at p. 634.)

Defendant contends this case is like *Sanchez* "because the prosecutor offered a number of separate and discrete acts which could support a

conviction for torture." More specifically, defendant asserts that "[i]n arguing for a torture conviction, the prosecutor told jurors how [defendant] injured [S.] on various occasions over the nine month period" charged in the information, and "[t]here were many separate and discrete acts which could have inflicted great bodily injury." Under these circumstances, defendant contends, "a unanimity instruction was necessary to ensure a unanimous jury verdict."

This court rejected a similar argument in *Sanchez*. Although a unanimity instruction was required in *Sanchez* on the animal abuse charge that was based on evidence of two discrete instances when the defendant allegedly kicked a dog, the court concluded no unanimity instruction was required on other animal abuse charges that were based on evidence the defendant "failed to provide adequate food and water for [certain] animals on an ongoing basis" and "failed to provide any medical treatment for a puppy that was severely wounded." (*People v. Sanchez, supra,* 94 Cal.App.4th at p. 634.) The defendant argued a unanimity instruction *was* required on those charges "because the prosecution distinguished between various incidents of animal abuse," but this court rejected that argument because it was "based on a misunderstanding of a continuous-course-of-conduct offense. By its very nature, [such an offense] is established by proof that the conduct took place repeatedly throughout the charged period of time." (*Id.* at p. 635.) Thus, proof of a course of conduct offense will usually consist of evidence of various incidents occurring over a period of time. However, where those incidents can reasonably be found to constitute a course of conduct, and the prosecution charges the crime as a course of conduct, no unanimity instruction is required. In such a case, "the multiple acts constitute one discrete criminal event." (*People v. Sanchez, supra,* 94 Cal.App.4th at p. 631.)

Because that was the case here with the charge of torture, the trial court did not err in failing to give a unanimity instruction on that charge.

B

*CALJIC No. 2.51*

At the apparent request of both parties, the trial court instructed the jury with CALJIC No. 2.51, as follows: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. [¶] Presence of motive may tend to establish the defendant is guilty. Absence of motive may tend to show the defendant is not guilty."

The court also instructed the jury on the crime of torture in part as follows: "Every person who, with the intent to cause cruel or extreme pain and

suffering for the purpose of revenge, persuasion, or for any sadistic purpose, inflicts great bodily injury upon the person of another, is guilty of the crime of torture . . . ." This instruction was consistent with the statutory definition of the crime.[11] (§ 206.)

■ Defendant contends the requirement that great bodily injury be inflicted for a certain "purpose" "creates a motive element of the offense" of torture, and "[i]t is error to give CALJIC No. 2.51 in a case where motive is an element." The People contend that notwithstanding the "purpose" language in section 206, motive is not an element of the crime of torture, and, in any event, any error was invited. As we will explain, we agree with the People's first argument. Because motive is not an element of the crime of torture, the trial court did not err in instructing the jury with CALJIC No. 2.51.

Our conclusion flows from *People v. Lynn* (1984) 159 Cal.App.3d 715 [206 Cal.Rptr. 181], which involved the crime of first degree murder by torture. Under section 189, "All murder which is perpetrated by . . . torture, or by any other kind of willful, deliberate, and premeditated killing . . . is murder of the first degree." More than 50 years ago, our Supreme Court explained that "[i]n determining whether the murder was perpetrated by means of torture the solution must rest upon whether the assailant's intent was to cause cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity." (*People v. Tubby* (1949) 34 Cal.2d 72, 77 [207 P.2d 51].) Thus, it has long been said that "[t]he essential elements of the crime are: ' ". . . (1) the act or acts which caused the death must involve a high degree of probability of death, and (2) the defendant must commit such act or acts with the intent to cause cruel pain and suffering for the purpose of revenge, extortion, persuasion or for any other sadistic purpose." ' " (*People v. Davenport* (1985) 41 Cal.3d 247, 267 [221 Cal.Rptr. 794, 710 P.2d 861]; see also *People v. Whisenhunt* (2008) 44 Cal.4th 174, 201 [79 Cal.Rptr.3d 125, 186 P.3d 496].)

In *Lynn*, the defendant argued it was prejudicial error to instruct the jury with CALJIC No. 2.51 when the trial court also instructed the jury in the language of the standard murder by torture instruction (CALJIC No. 8.24) that one of the essential elements of the crime was that the defendant acted with the intent to cause cruel pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose. (*People v. Lynn, supra,* 159 Cal.App.3d at pp. 727–728.) The appellate court rejected that argument, concluding that the "purpose" language in the instruction "does not elevate motive to the status of an element of torture murder. Rather, as CALJIC

---

[11] The instruction the court gave omitted the word "extortion," which is included in the statute, presumably because the People did not contend defendant acted with the intent to cause S. pain for that purpose.

No. 2.51 instructs, the presence or absence of motive remains a circumstance in the case which may tend to establish guilt or innocence. CALJIC No. 8.24 simply makes explicit the treatment of motive as an element of proof in torture murder cases rather than as an element of the crime. The instruction does not change the treatment of motive from that in other first degree murder cases. [Citation.] Thus, the trial court committed no error in instructing on motive." (*People v. Lynn, supra,* 159 Cal.App.3d at p. 728.)

Defendant contends *Lynn* is distinguishable because with respect to the crime of torture, as opposed to the crime of murder by torture, "the language requiring an intent to cause cruel pain and suffering 'for the purpose of revenge, extortion, persuasion or for any sadistic purpose' [is] codified into the statute [§ 206] as part of the definition of the offense" and therefore can "no longer be dismissed as an element of proof . . . rather than as an element of the crime." We are not persuaded. The "purpose" language at issue here may not appear in the statute that makes murder by torture a crime (§ 189); nevertheless, case law from our Supreme Court long ago established that such a purpose is an "essential *element*" of the crime of murder by torture. (See *People v. Davenport, supra,* 41 Cal.3d at p. 267.) Thus, *Lynn* stands for the proposition that motive is not an element of the crime of murder by torture, even though one of the essential elements of that crime is that the prohibited act be committed with the intent to cause pain for a specific purpose.

Recently, in *People v. Whisenhunt, supra,* 44 Cal.4th 174, our Supreme Court approved the *Lynn* court's analysis of this issue. In *Whisenhunt,* the defendant contended CALJIC No. 2.51 "had the effect of negating the element of 'sadistic purpose' in the first degree murder by torture instruction, CALJIC No. 8.24" and, acknowledging that his argument had been rejected already in *Lynn,* asked the Supreme Court to disapprove *Lynn.* (*People v. Whisenhunt, supra,* 44 Cal.4th at p. 218.) The Supreme Court refused to do so because the court "conclude[d] *Lynn* correctly decided this issue . . . . As [the Supreme Court had] noted in rejecting another similar challenge to CALJIC No. 2.51, 'although malice and certain intents and purposes are elements of the crimes, . . . *motive* is not an element.' (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503–504 [117 Cal.Rptr.2d 45, 40 P.3d 754].) 'Motive describes the reason a person chooses to commit a crime. The reason, however, is different from a required mental state such as intent or malice.' " (*Whisenhunt,* at p. 218.)

There is no principled basis on which to distinguish between the crime of torture and the crime of murder by torture on this point. One of the elements of both crimes is that the perpetrator commit the prohibited act with the intent of causing pain for a particular purpose. If, as held in *Lynn* and *Whisenhunt,*

motive is not an element of torture by murder, then similarly it is not an element of torture. Accordingly, the trial court did not err in instructing the jury with CALJIC No. 2.51.

C

*Lesser Included Offenses*

Defendant contends the trial court erred in failing to instruct on three different lesser included offenses. We address each of those offenses in turn.

1. *Attempted Torture*

Defendant contends the trial court should have instructed the jury on attempted torture as a lesser included offense of torture. We disagree.

 In any criminal prosecution, "The jury . . . may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense." (§ 1159.) Thus, where there is evidence that would absolve the defendant from guilt of the charged offense but would support a finding of guilt of attempt to commit the charged offense, an instruction on attempt is mandatory. (See *People v. Crary* (1968) 265 Cal.App.2d 534, 540 [71 Cal.Rptr. 457].)

What that means here is that if the evidence was susceptible of the reasonable interpretation that defendant was guilty of attempted torture, but not the completed crime, the trial court had a duty to instruct the jury on attempt. Defendant contends that was the case because "there was . . . an arguable basis to doubt whether the act or acts [of violence he committed against S.] succeeded in actually inflicting great bodily injury upon her." Defendant contends that "[a]lthough medical evidence showed that [S.] had rib fractures and a fractured nose, the evidence did not clearly establish how these injuries occurred." Specifically, defendant points to evidence that S. told their daughter she broke her ribs falling over a skateboard. Defendant further contends there was evidence "that the bruising to [S.'s] face and body was not caused by [him], but was the result of an assault committed by Rock Clum." Finally, he asserts that while there was evidence he "struck [S.] in the head and body with a derringer in his ha[n]d as they drove through Roseville, . . . the evidence did not clearly establish that great bodily injury was inflicted . . . on that occasion."

In response, the People argue that a charge of attempted torture was not supported by substantial evidence because defendant "denied beating [S.], with the exception of slapping her one time and shoving a laundry basket at

her in self-defense." According to the People, defendant "did not present any evidence suggesting that he acted with the requisite intent to commit torture, but simply failed to cause great bodily injury."

As defendant points out in his reply brief, however, the People "err[] by focusing only on evidence presented by the defense." The question here is not whether the jury reasonably could have found—based only on defendant's evidence—that he committed attempted torture but not the completed crime, but whether the jury could have made that finding based on *all* the evidence presented, including that presented by the People. (See *People v. Breverman* (1998) 19 Cal.4th 142, 162–163 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

Although the People's response to defendant's argument is unconvincing, we nonetheless reject defendant's argument that an instruction on attempted torture was required here. Defendant's argument rests on the premise that the jury reasonably could have found that he tried to torture S. but failed to complete the crime because his acts were not the cause of S.'s broken ribs, broken nose, and bruising over her face and body. In defendant's view, the jury could have found that, instead, the broken ribs were caused by an accidental fall over a skateboard, and the bruising was caused by an assault committed by Rock Clum. Defendant offers no specific alternate explanation for the broken nose.

For a sua sponte instruction on attempt to be required, however, there must be "evidence that a reasonable jury could find persuasive" on the point. (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8 [47 Cal.Rptr.2d 569, 906 P.2d 531].) The evidence on which defendant relies is not such evidence. Essentially, the jury would have had to believe S.'s testimony that defendant hit her to persuade her to go along with his story about the molestation and the satanic cult, but at the same time believed that S.'s broken bones and other physical injuries were not caused by defendant's beatings but had other causes. Most significantly, to accept defendant's argument, the jury would have had to believe S.'s statement to police that a man she assumed was Rock Clum beat her. But at the same time S. made this statement to police, she told police that defendant never beat her. Thus, the jury would have had to believe the part of S.'s statement to police that Rock Clum beat her, while at the same time disbelieving her statement to police that defendant never beat her. Because we are not persuaded a *reasonable* jury would have made these conflicting credibility determinations, we find no substantial evidence to support an instruction on attempted torture in this case.

### 2. *Assault by Means of Force Likely to Produce Great Bodily Injury*

Defendant contends the trial court should have instructed the jury on assault by means of force likely to produce great bodily injury as a lesser included offense of torture. We disagree.

 The trial court must instruct sua sponte on "lesser included offenses if the evidence 'raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense.' " (*People v. Lopez* (1998) 19 Cal.4th 282, 287–288 [79 Cal.Rptr.2d 195, 965 P.2d 713].) "To determine whether a lesser offense is necessarily included in the charged offense, one of two tests (called the 'elements' test and the 'accusatory pleading' test) must be met. The elements test is satisfied when ' "all the legal ingredients of the corpus delicti of the lesser offense [are] included in the elements of the greater offense." [Citation.]' [Citations.] Stated differently, if a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former. [Citations.] [¶] Under the accusatory pleading test, a lesser offense is included within the greater charged offense ' "if the charging allegations of the accusatory pleading include language describing the offense in such a way that if committed as specified the lesser offense is necessarily committed." ' " (*Id.* at pp. 288–289.)

 Here, defendant argues that assault by means of force likely to produce great bodily injury is a lesser included offense of torture under the elements test because "[a]ny person who inflicts great bodily injury with the intent to torture is necessarily guilty of felony assault for use of force likely to produce great bodily injury." Not so. Torture requires actual infliction of great bodily injury, but it does not require that the injury be inflicted by *any* means of force, let alone by means of force likely to produce great bodily injury. For example, a caretaker would be guilty of torturing an immobile person in his care if the caretaker, acting with the intent to cause extreme suffering for a sadistic purpose, deprived that person of food and water for an extended period of time, resulting in great bodily injury to the person. In such a circumstance, the caretaker would have inflicted great bodily injury without using any force and thus would not be guilty of committing assault by means of force likely to produce great bodily injury. Because the use of force is not a necessary element of the crime of torture, assault by means of force likely to produce great bodily injury is not a lesser included offense of torture.

### 3. *Spousal Battery*

Defendant contends the trial court should have instructed the jury on spousal battery (also called misdemeanor spousal abuse) as a lesser included offense of inflicting corporal injury on a spouse (also called felony spousal abuse, even though it is actually a wobbler). We are not persuaded.

Defendant was convicted of three counts of inflicting corporal injury on a spouse in violation of section 273.5, subdivision (a).[12] Spousal battery in violation of section 243, subdivision (e)(1)[13] is a lesser included offense of inflicting corporal injury on a spouse. (*People v. Jackson* (2000) 77 Cal.App.4th 574, 580 [91 Cal.Rptr.2d 805].)

Defendant contends the lesser offense of spousal battery was supported by substantial evidence—and therefore the jury should have been instructed on that offense—based on his own testimony regarding (1) "the Super Bowl Sunday incident" (which was the basis for the inflicting corporal injury charge in count IX) and (2) the "laundry room" incident (which was the basis for the inflicting corporal injury charge in count XVII).[14] Specifically, with regard to the Super Bowl Sunday incident, defendant suggests the jury could have convicted him of only spousal battery based on his testimony that he did not strike S. in the ribs with a knuckle punch but did slap her in anger. With regard to the laundry room incident, he suggests the jury could have convicted him of the misdemeanor based on his testimony that he did not strike S. but did deflect "a laundry basket into her face which aggravated a prior injury, causing her nose to bleed."

The People's response to this argument founders on a mistaken premise. The People contend we must reject defendant's argument because spousal battery is not "a necessarily lesser included offense of *torture*." (Italics added.) But that is not defendant's argument; his argument (as we have explained) is that spousal battery is a lesser included offense of inflicting corporal injury on a spouse—and the People acknowledge that this is so. Having acknowledged this, however, the People do not address defendant's contention that the evidence justified an instruction on spousal battery as a lesser included offense of inflicting corporal injury on a spouse, rather than as a lesser included offense of torture.

---

[12] "Any person who willfully inflicts upon a person who is his or her spouse, former spouse, cohabitant, former cohabitant, or the mother or father of his or her child, corporal injury resulting in a traumatic condition, is guilty of a felony, and upon conviction thereof shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not more than one year, or by a fine of up to six thousand dollars ($6,000) or by both that fine and imprisonment." (§ 273.5, subd. (a).)

[13] "When a battery is committed against a spouse, a person with whom the defendant is cohabiting, a person who is the parent of the defendant's child, former spouse, fiance, or fiancee, or a person with whom the defendant currently has, or has previously had, a dating or engagement relationship, the battery is punishable by a fine not exceeding two thousand dollars ($2,000), or by imprisonment in a county jail for a period of not more than one year, or by both that fine and imprisonment." (§ 243, subd. (e)(1).)

[14] Because defendant offers no argument directed to the felony spousal abuse charge in count XIII, which was based on "the van ride," we do not address that charge further.

Despite the People's failure to address defendant's actual argument, we conclude defendant has not carried his burden of showing that the trial court erred when it did not instruct the jury on spousal battery. As we have explained, the trial court must instruct sua sponte on "lesser included offenses if the evidence 'raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense.' " (*People v. Lopez, supra,* 19 Cal.4th at pp. 287–288.) Given that it is defendant's burden, as the appellant, to show that the trial court erred (see, e.g., *People v. Alvarez* (1996) 49 Cal.App.4th 679, 694 [56 Cal.Rptr.2d 814]), it falls to him to explain—with respect to both the Super Bowl Sunday incident and the laundry room incident—how the evidence here raised a question as to whether all of the elements of inflicting corporal injury on a spouse were present and that there was evidence that would have justified a conviction of spousal battery instead.

Defendant offers no such explanation. While he quotes the spousal battery statute, he makes no attempt to explain the elements of that crime or to show how those elements were satisfied by his testimony regarding the two incidents. Further, he offers no discussion of the elements of inflicting corporal injury on a spouse and no discussion of how the evidence upon which he relies raised a question as to whether all of the elements of that crime were present. Instead, he summarily recounts, in two sentences, his testimony regarding the two incidents, and then asserts that the "lesser offenses were supported by substantial evidence." This is not sufficient to demonstrate trial court error; accordingly, we find none.

### D

### *Accomplice Instruction*

Defendant contends that because S. "participated in telling the children the same [upsetting] stories" that were the basis for the child abuse charges against him, accomplice instructions should have been given. We find no error.

 " ' "[W]henever the testimony given upon the trial is sufficient to warrant the conclusion upon the part of the jury that a witness implicating a defendant was an accomplice," ' the trial court must instruct the jury, sua sponte, to determine whether the witness was an accomplice." (*People v. Zapien* (1993) 4 Cal.4th 929, 982 [17 Cal.Rptr.2d 122, 846 P.2d 704].) Defendant contends there was evidence in the case that would have warranted a finding that S. was his accomplice in the abuse of the children because "[S.] actively participated in the same storytelling that was charged against [him]." Defendant acknowledges, however, that to be an accomplice, one must act

with "consent," and not merely "assent." " 'Consent, in law, means a voluntary agreement by a person in the possession and exercise of sufficient mentality to make an intelligent choice, to do something proposed by another.' " (*People v. Dong Pok Yip* (1912) 164 Cal. 143, 147 [127 P. 1031].) Assent, on the other hand, " 'means mere passivity or submission, which does not include consent.' " (*Ibid.*) Thus, for the jury to have found S. was defendant's accomplice, there must have been sufficient evidence for the jury to conclude that S. acted with consent, and not with mere assent, when she told the children the same stories that defendant did.

Unfortunately, defendant does not address this issue. He acknowledges that it is for the jury to decide if the alleged accomplice acted with consent and not merely with assent. (See, e.g., *People v. Olds* (1957) 154 Cal.App.2d 78, 82 [315 P.2d 881].) But he fails to proceed to the next logical step, which is to show, based on the evidence in the record, that there was sufficient evidence for the jury to find that S. acted with consent, and not with mere assent. Instead, he simply asserts that because it is for the jury to decide, "[i]t is clear . . . that the court erred in failing to give accomplice instructions." Such ipse dixit is not sufficient to demonstrate error. Absent a persuasive showing, based on the evidence, that a reasonable jury could have concluded S. acted with consent, we must conclude that defendant has failed to show error in the failure of the trial court to give the jury accomplice instructions.

E

*CALJIC No. 2.20*

The trial court instructed the jurors pursuant to CALJIC No. 2.20 with a nonexclusive list of factors they could consider in determining the believability of a witness. In doing so, the trial court omitted one of the optional paragraphs of the instruction, which tells the jury it can consider "[p]ast criminal conduct of a witness amounting to a misdemeanor."[15] (See *People v. Fraser* (2006) 138 Cal.App.4th 1430, 1451, fn. 6 [42 Cal.Rptr.3d 424].) Defendant contends this omission was prejudicial error because there was evidence S. knowingly made false reports of crimes to the police and the jurors should have been instructed they could consider this evidence in determining her credibility.

CALJIC No. 2.20 or its equivalent "should . . . always be given," although "those paragraphs thereof inapplicable under the evidence may be omitted. . . ."

---

[15] Evidence of nonfelony conduct involving moral turpitude is relevant to the credibility of a witness because such conduct may suggest a willingness to lie. (*People v. Wheeler* (1992) 4 Cal.4th 284, 295 [14 Cal.Rptr.2d 418, 841 P.2d 938].)

(*People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 883–884 [123 Cal.Rptr. 119, 538 P.2d 247].) A person who knowingly makes a false report of a crime to a peace officer is guilty of a misdemeanor. (§ 148.5.) Thus, evidence that S. knowingly made a false report of a crime to law enforcement was relevant to her credibility, justifying the inclusion of the paragraph from CALJIC No. 2.20 that the trial court omitted.

The People do not deny there was evidence S. knowingly made false reports of crimes to law enforcement. Instead, the People contend that because there was "evidence indicating that [S.] made the false reports . . . because she was scared that [defendant] would kill her," "the evidence suggested that [S.] did not act with criminal intent, but rather under duress."

The People are mistaken. It is true duress can negate the intent or capacity to commit a crime. (*People v. Petznick* (2003) 114 Cal.App.4th 663, 676 [7 Cal.Rptr.3d 726]; see also § 26 ["All persons are capable of committing crimes except . . . [¶] . . . [¶] . . . Persons . . . who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused."].) However, "Duress is an effective defense only when the actor responds to an immediate and imminent danger." (*People v. Heath* (1989) 207 Cal.App.3d 892, 900 [255 Cal.Rptr. 120].) "Decisions upholding the duress defense have uniformly involved ' "a present and active aggressor threatening immediate danger." ' [Citation.] A 'phantasmagoria of future harm' such as a threat of death to be carried out at some undefined time, will not diminish criminal culpability." (*Petznick*, at pp. 676–677.)

The evidence to which the People point does not support their assertion that S. made her false reports to law enforcement under duress, as we have explained that term above. In one instance in which she claimed she made false statements to law enforcement because she was "afraid," defendant was "out in the hall." In another instance, she asserted she lied to law enforcement because she was "scared of" defendant and "wanted to stay alive," but at the time she made those statements defendant was not present because he had been taken to the hospital after accidentally shooting himself. Thus, the People do not cite any evidence that would support a finding S. acted out of duress in making false statements to law enforcement.

We do agree with the People's argument, however, that even if the failure to include the omitted paragraph of CALJIC No. 2.20 was error, defendant has failed to show any prejudice from the error. Defendant's prejudice argument in his opening brief is perfunctory, asserting only that because it was a close case that "was in large part a credibility contest between [him] and [S.], . . . there is a reasonable chance" that giving the omitted paragraph from CALJIC No. 2.20 would have resulted in his acquittal on all charges.

The problem with defendant's prejudice argument—other than its brevity—is this: Defendant takes the position that if the jurors had been instructed with the omitted paragraph of CALJIC No. 2.20 regarding past criminal conduct, it is reasonably probable they would have disbelieved more of S.'s testimony about what he did to her because they would have determined she was not credible due to the fact that she had made false statements to law enforcement. But to believe S. made false statements to law enforcement, the jurors would have had to *believe* S.'s trial testimony, because—as defendant himself points out—it was S. who testified at trial that her initial statements to law enforcement were false. In other words, to find S. was not credible pursuant to the omitted paragraph of CALJIC No. 2.20, the jury would have first had to find she *was* credible. No valid claim of prejudicial error can rest on such a contradiction. Accordingly, we find no prejudicial error in the omission of the paragraph of CALJIC No. 2.20 relating to past criminal conduct.

## V

### *New Trial Motion*

In moving for a new trial, defendant asserted three incidents of juror misconduct that he continues to argue on appeal. First, he asserted that during the first week of trial, Juror No. 63 said he thought a guilty verdict would be a " 'slam dunk . . . a no-brainer.' " Second, he asserted that during deliberations the same juror told his fellow jurors that he had "performed an online search for definitions of 'great bodily injury.' " Third, he asserted that Juror No. 32 had tried to bring a dictionary into the jury room during deliberations.

In a supplemental motion for new trial, defendant argued the trial court committed legal error in relation to the dictionary incident because the bailiff told the court that he had stopped a juror from bringing a dictionary into the jury room, but the court never notified or advised the defense about this incident.

We address each of these arguments below.

### A

### *Juror Misconduct*

#### 1. *Predeliberation Statement*

In support of his new trial motion, defendant offered a declaration from Juror No. 151, who attested that during the first week of trial, Juror No. 63

"stated that he thought that a guilty verdict would be a 'slam dunk . . . a no brainer.' This statement was made long before the end of testimony and long before the jury began its deliberations." Defendant argued that this evidence showed Juror No. 63 had prejudged his guilt and was not impartial and unprejudiced.

In response, the People offered declarations from two other jurors who attested that they either did not hear or did not recall hearing any juror make a statement regarding defendant's guilt or innocence before deliberations. The People also argued that "the jury verdicts in this case fly in the face of this alleged statement since the jury, in fact, returned a number of not guilty verdicts."

In ruling on this aspect of the new trial motion, the court pointed out that "there is really no context for [Juror No. 63's] remarks other than what . . . (Juror No. 151) said in her affidavit. . . . And we don't know if he was joking. We don't know if he was speculating out loud, we don't know if there are any qualifiers like: A guilty verdict would be a slam dunk if there is no other evidence presented. [¶] It is just a dangling remark by . . . (Juror No. 63) that is inadequate to show misconduct." The court also concluded that because Juror No. 63 had voted with the rest of the jurors in "return[ing] seven not guilty charges" and in "not find[ing] great bodily injury allegations of certain specific counts to be true," "it is pure speculation to conclude that those predeliberation remarks indicate he had a preexisting bias that continued throughout the trial and prejudiced the case."

The court also addressed itself directly to Juror No. 151, who was apparently in attendance, and stated, "With all due respect, . . . I think you have a bias or interest in seeing that the new trial motion [is] granted, and in my view your affidavit raises serious credibility problems." The court went on to discuss how in a supplemental declaration Juror No. 151 claimed essentially that Juror No. 32 "said he had made up his mind about guilt prior to the completion of trial." The court pointed out that in his own declaration, Juror No. 32 essentially said "he reached verdicts only after discussing the evidence with the other jurors" and "[h]e listened to all the evidence before the verdicts were reached." The court said that "insofar as there is a conflict in the affidavits, then regrettably this Court must seriously question the credibility of" Juror No. 151. The court also noted that Juror No. 151 was "now . . . telling the Court that she was pressured to vote guilty, she would not vote that way now, and she considers a life sentence unfair."[16] The court questioned Juror No. 151's credibility in light of the fact that "she didn't point out to [the court] that she felt pressure when she affirmed her guilty

---

[16] In her original declaration, Juror No. 151 stated that she "felt pressure to vote guilty, particularly on the torture charge" and "[i]f [she] were able to vote again, [she] would not vote

verdict in court." The court concluded by saying that "[f]or all these reasons, the Court cannot accept . . . (Juror No. 151's) rendition of the facts about . . . (Juror No. 32['s]) or . . . (Juror No. 63['s]) remarks or conduct. And in light of that fact, the defense has not shown either misconduct or prejudice" and "I do not for all those reasons think an evidentiary hearing is warranted or that the claim has been established."

In his opening brief, defendant argues that Juror No. 63's statement constituted misconduct. What he fails to address, however, is the fact that Juror No. 151 was the only person who attested to the statement by Juror No. 63, and the trial court expressly refused to accept Juror No. 151's "rendition of the facts" because the court found Juror No. 151 was not credible.

In his reply brief, defendant addresses this issue for the first time. Citing *People v. Nesler* (1997) 16 Cal.4th 561, 582 [66 Cal.Rptr.2d 454, 941 P.2d 87], for the proposition that an appellate court "accept[s] the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence," defendant argues there was no substantial evidence to support the trial court's finding that Juror No. 151's allegations of misconduct by Juror No. 63 were not credible (assuming the court implicitly made such a finding).

 Under California law, "The power to judge the credibility of witnesses and to resolve conflicts in the testimony is vested in the trial court . . . ." (*In re Carpenter* (1995) 9 Cal.4th 634, 646 [38 Cal.Rptr.2d 665, 889 P.2d 985].) "It is an established principle that the credibility of witnesses and the weight to be given their testimony are matters within the *sole* province of the trier of fact . . . ." (*As You Sow v. Conbraco Industries* (2005) 135 Cal.App.4th 431, 454 [37 Cal.Rptr.3d 399], italics added.) "A trier of fact may accept such witnesses as he wishes and reject others . . . ." (*Green Trees Enterprises, Inc. v. Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 787 [59 Cal.Rptr. 141, 427 P.2d 805].) "Where there is conflicting testimony, reviewing courts recognize that the trier of the facts has the better opportunity to judge the credibility of witnesses. In such a case the trial court's findings of fact, to the extent that they rest upon an evaluation of credibility, should be regarded as *conclusive* on appeal." (*Estate of Fries* (1965) 238 Cal.App.2d 558, 561 [47 Cal.Rptr. 888], italics added.) "[S]o long as the trier of fact does not act arbitrarily and has a rational ground for doing so, it may reject the testimony of a witness even though the witness is uncontradicted. [Citations.] Consequently, the testimony of a witness which has been rejected by the trier of

---

for guilty." She also asserted her understanding that defendant "will be sentenced to life in prison if the torture conviction stands" and her belief "that a life sentence is not a fair punishment in this case."

fact cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved." (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1204 [52 Cal.Rptr.2d 518].)

Here, the trial court—which was the trier of fact for purposes of defendant's attempt to establish juror misconduct as a basis for a new trial—rejected Juror No. 151's assertion that Juror No. 63 made a statement during the early stages of the trial that showed he had prejudged the case based on what the court characterized as Juror No. 151's "serious credibility problems." The court's credibility assessment was not arbitrary or irrational, but instead was based on the fact that Juror No. 151's declaration conflicted with the declaration filed by Juror No. 32 on various points and on the fact that Juror No. 151 was now taking a position on defendant's guilt contrary to the way she voted at trial.

Defendant attempts to discount the trial court's reasoning, contending that a careful examination of the declarations shows there was no conflict and that a "change of heart after learning of the severity of [defendant's] sentence does not provide a rational reason to question [Juror No. 151's] credibility." We are not persuaded on either point.

First, Juror No. 151 plainly asserted in her supplemental declaration that "[a]fter verdicts were reached and just before going into court for the reading of those verdicts, [Juror No. 32] made a blanket apology to the group of jurors, saying that he knew he had been unpleasant to some people and that those people knew who they were. He also said that he had opinions prior to the completion of the trial that he stated and he knew he shouldn't have done that. He said that he had his mind made up 'ahead of time.'" In his declaration, Juror No. 32 just as plainly asserted that he "listened to all of the evidence in this case before forming any opinion as to [defendant]'s guilt or innocence" and "never expressed an opinion about his guilt or innocence prior to the start of deliberations." Juror No. 32 admitted "apologiz[ing] to the group of jurors early on in deliberations," but specifically denied that the apology was made "right before we went into the courtroom for reading of the verdicts." On these facts, the trial court was entitled to conclude the declarations were in conflict and that Juror No. 151's credibility was therefore subject to question.

Second, on this record the trial court was entitled to conclude that Juror No. 151 was suffering more than simply a "change of heart after learning of the severity of [defendant's] sentence," as defendant characterizes it. The trial court could rationally conclude that Juror No. 151 was trying to impeach her own verdict by asserting she was pressured into voting guilty and would not

do so again if given the opportunity. Furthermore, the trial court could rationally conclude that Juror No. 151 had "a bias or interest in seeing that the new trial motion be granted" given her expressed view that a life sentence for torture would not be "fair."

■ Defendant contends that "[i]f the court had questions about Juror No. 151's credibility, that was an issue that could only be resolved at an evidentiary hearing." The authority he cites, however, does not support that proposition. In *People v. Hedgecock* (1990) 51 Cal.3d 395 [272 Cal.Rptr. 803, 795 P.2d 1260], our Supreme Court held that "when a criminal defendant moves for a new trial based on allegations of jury misconduct, the trial court has discretion to conduct an evidentiary hearing to determine the truth of the allegations. We stress, however, that the defendant is not entitled to such a hearing as a matter of right. Rather, such a hearing should be held only when the trial court, in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact." (*Id.* at p. 415.) Thus, it is within the trial court's discretion to determine whether an evidentiary hearing is necessary, even when there are conflicts in the declarations. Here, the trial court determined that an evidentiary hearing was not necessary, and defendant has shown no abuse of discretion in that determination.

Finally, defendant argues that reviewing courts defer to credibility determinations by trial courts in ruling on issues of juror misconduct only "because the 'trial court [is] in the best position to observe [the juror's] demeanor,' " and therefore "there is no reason to give deference to credibility determinations that did not result from an actual hearing." Defendant does not cite any authority establishing that deference to the trial court's credibility determinations is justified only when there has been an evidentiary hearing in which live witnesses testify. Regardless of whether Juror No. 151 took the witness stand, the trial court was indisputably in a better position than we are to assess her demeanor, in that the trial court had the opportunity to observe her not only throughout trial, but also at the hearing on defendant's new trial motion, where the court directed comments directly to her. In any event, even if we did not defer to the trial court's credibility determination, we would nonetheless agree with the court that the conflict in the jurors' declarations and Juror No. 151's "recantation and inconsistent positions" regarding defendant's guilt provided a rational basis for the court to find that Juror No. 151's assertion regarding the statement made by Juror No. 63—which no other juror verified—was not sufficiently credible to warrant a finding of misconduct. Consequently, we find no error in the trial court's denial of the new trial motion on this basis.

### 2. *Online Search*

In support of his new trial motion, defendant offered the declarations of three jurors who attested that during deliberations Juror No. 63 told his fellow jurors that he had performed an online search for definitions of "great bodily injury" but came up with no information as a result of the search. The trial court found that Juror No. 63 committed misconduct by doing the online search, but also noted that it was "undisputed that no information was conveyed to . . . the other jurors" and there was "no . . . affirmative evidence that . . . (Juror No. 63) learned anything himself." Because the court concluded it was "pure speculation that he did learn anything," the court concluded the presumption of prejudice arising from the misconduct was "rebutted here."

On appeal, defendant contends the trial court erred in finding the presumption of prejudice was rebutted. Defendant argues that once the court found misconduct, the "presumption of prejudice could be rebutted only by proof that no prejudice actually resulted. The court could not deny relief by finding the issue of prejudice too speculative."

 We find no error. "As a general rule, juror misconduct 'raises a presumption of prejudice . . . .' " (*In re Hitchings* (1993) 6 Cal.4th 97, 118 [24 Cal.Rptr.2d 74, 860 P.2d 466].) "This presumption of prejudice ' "may be rebutted by an affirmative evidentiary showing that prejudice does not exist *or* by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party [resulting from the misconduct]. . . ." ' " (*Id.* at p. 119, italics added.)

Here, the only evidence before the trial court was that while Juror No. 63 attempted to find a definition of "great bodily injury" online, *he came up with no information.*[17] This fact itself tends to rebut the presumption of prejudice because it supports the reasonable conclusion that no actual harm occurred from the search because no information was actually received from an extraneous source as a result of the search.

Defendant argues that "[u]nless a computer crashes before the search can go through, it is impossible to conduct an internet search of 'great bodily injury' and obtain no results at all." Thus, in defendant's view, despite Juror No. 63's assertion to the other jurors that he came up with no information, he "must have looked at something," and because "[t]he People failed to show what he actually found," the presumption of prejudice was not rebutted.

---

[17] Defendant points to a statement by one of the jurors claiming that Juror No. 63 said he " 'couldn't find any definitive information.' " (Italics omitted.) That statement was not *evidence*, however, as it was contained in an unsworn letter to the trial judge rather than in a sworn declaration.

We are not persuaded. "[W]hen misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial. The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.] The judgment must be set aside if the court finds prejudice under either test." (*In re Carpenter, supra*, 9 Cal.4th at p. 653.)

Here, we cannot say that some unknown information Juror No. 63 may have seen while conducting an online search for a definition of "great bodily injury" is substantially likely to have influenced him in a manner detrimental to defendant. Likewise, we cannot say that the nature of the misconduct—an attempt to find a definition for a term defendant himself admits has no special legal meaning—viewed in light of the surrounding circumstances—including Juror No. 63's statement to other jurors that he came up with no information as a result of the search—suggests a substantial likelihood that Juror No. 63 was actually biased against defendant.

For the foregoing reasons, we conclude the trial court did not err in finding the presumption of prejudice was rebutted and in denying defendant's new trial motion on this basis.

### 3. *Attempted Use of Dictionary*

In support of his new trial motion, defendant offered the declaration of a defense investigator, who attested that she had spoken with Juror No. 32, who told her that "he brought a regular or legal dictionary with him to court for use in deliberations" and "asked the bailiff if he could bring the dictionary into the jury room and was told he could not do that" so he "put the dictionary back in his jacket pocket."

In his own declaration, Juror No. 32 admitted that "[a]t the beginning of deliberations [he] asked a bailiff if it would be appropriate to have a dictionary in the jury room. [He] was told it would not be appropriate and the dictionary was never used."

The trial court found that what Juror No. 32 did was improper, but because he "never used the dictionary" and "[n]o other juror says he brought forth any other information that he may have gained outside court," it was "minor or trivial misconduct" that "clearly does not show any prejudice or the presumption of prejudice is rebutted."

On appeal, defendant asserts that Juror No. 32's declaration "did not identify the actual dictionary that he tried to take into the deliberation room" and "does not state th[at] he himself did not up look up [a] definition," "[a]nd if he did . . . , it is impossible to determine from the record the actual definition that he looked at." Based on this, defendant apparently contends the presumption of prejudice was unrebutted.

Defendant is mistaken. Even assuming that evidence a juror *tried* to bring, but did not succeed in bringing, a dictionary into the deliberation room constitutes evidence of juror misconduct, the record here rebuts any presumption of prejudice. It is undisputed that upon being told he could not use the dictionary, he made no attempt to use it. Accordingly, he received no information from an extraneous source, and there is no reasonable probability of actual harm to defendant.

### B

### *Denial of Counsel*

In a supplemental new trial motion, defendant argued the trial court committed legal error because the trial court did not notify or advise the defense about the dictionary incident when it happened. At the hearing on the motion, the court admitted "that was a mistake on my part. . . . I should have brought it to your attention . . . . But since there was nothing that affected the verdict as a result of my mistake, I think it was harmless error on my part."

On appeal, defendant contends the trial court's failure to advise the defense that Juror No. 32 had requested permission to bring a dictionary into the deliberation room was error from which a strong presumption of prejudice arises, and "[b]ecause the presumption of prejudice has not been rebutted, [he] is entitled to a new trial."

We are unpersuaded. In *People v. Hogan* (1982) 31 Cal.3d 815 [183 Cal.Rptr. 817, 647 P.2d 93] (the case on which defendant primarily relies), our Supreme Court concluded that the defendant "was denied the right to counsel when the trial judge, without notifying counsel, responded to jury requests to see various trial exhibits during deliberations." (*Id.* at p. 848.) The court further noted that "if the denial of the right to counsel during jury deliberations may have affected substantial rights of a defendant, prejudice is presumed and '[o]nly the most compelling showing to the contrary will overcome the presumption.' " (*Id.* at p. 849.)

This case is distinguishable from *Hogan*. In *Hogan*, it was clear that the denial of the right to counsel affected the substantial rights of the defendant

because the trial court sent all of the requested exhibits to the jury room, including a tape recording that included "inadmissible and highly prejudicial material concerning [the defendant]'s reluctance to take a lie detector test [that] would never have reached the jury" otherwise. (*People v. Hogan, supra,* 31 Cal.3d at pp. 844–845, 850.) Thus, the presumption of prejudice was entirely justified (and unrebutted). Here, on the other hand, defendant does not attempt to explain how the trial court's failure to contact the defense affected his substantial rights, when by the time the court first learned of the matter the bailiff had already told the juror he could not use a dictionary, and the juror did not, in fact, use it. Under the circumstances of this case, as opposed to those in *Hogan,* we see no basis for presuming prejudice.

This case is more akin to *People v. Garrison* (1989) 47 Cal.3d 746 [254 Cal.Rptr. 257, 765 P.2d 419] than it is to *Hogan.* In *Garrison,* the trial court responded to a jury request for the rereading of a defense witness's testimony without consulting with defense counsel, whom the court was unable to locate. (*Id.* at p. 783.) On the defendant's claim that he was denied the right to counsel, the Supreme Court pointed out that the testimony in issue was unquestionably favorable to the defendant and wrote, "It defies imagination to believe that any defense counsel would have disapproved of the jury rehearing the testimony of this very favorable witness. The trial court was undoubtedly aware of this when it granted the jury's request for the reread. Under the strictest test of prejudice, any error in rereading the . . . testimony in the absence of counsel is harmless beyond a reasonable doubt." (*Ibid.*)

The same can be said here: It defies imagination to believe that any defense counsel would have disapproved of what the bailiff told the juror—that he could not bring the dictionary into the deliberation room. Thus, any error was harmless even under the strictest test of prejudice.

## VI

### Sentencing Issues

### A

### Imposition of Upper Term

In imposing the upper terms on the criminal threat conviction and the three convictions for inflicting corporal injury on a spouse, the trial court noted that defendant's lack of a prior criminal record was a mitigating circumstance, but that circumstance was outweighed by several aggravating circumstances, namely: (1) defendant "induced others to participate in the commission of the

crime or occupied a position of leadership or dominance of other participants in its commission"; (2) defendant "induced a minor to commit or assist in the commission of a crime against their [*sic*] mother"; (3) "the plan was carried out with planning, sophistication, and professionalism"; (4) defendant "took advantage of a position of trust or confidence to commit the crimes"; and (5) defendant "engaged in violent conduct, indicating [he is] a serious danger to society."

Defendant contends the trial court's imposition of the upper terms violated his federal constitutional rights under *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856] because "there was no legally sufficient aggravating circumstance found to exist by the jury, admitted by the defendant, or justified based on defendant's record of prior convictions."

The People contend any *Cunningham* error was harmless because if the aggravating circumstances on which the trial court relied had been presented to the jury, the jury would have found three of those circumstances true beyond a reasonable doubt—specifically, "the violence of the crimes, defendant's position of trust in the household, and the involvement of his minor sons in at least one criminal act." (See *People v. Sandoval* (2007) 41 Cal.4th 825, 839 [62 Cal.Rptr.3d 588, 161 P.3d 1146].) In making this argument, however, the People do not try to specifically tie any particular aggravating circumstance to any particular conviction on which the trial court imposed the upper term and explain how the evidence underlying that conviction unquestionably justified the aggravating circumstance the trial court found. Instead, the People paint with a broad brush, asserting—for example—that defendant "did not deny involving the children in every aspect of the lawsuit against [S.]'s father." But "the lawsuit against [S.]'s father" was not a crime of which defendant was convicted, and therefore this assertion does nothing to support the People's claim of harmless error in the trial court's imposition of the upper terms. The crimes at issue here are the criminal threat—when defendant told S. he would kill her—and three instances in which defendant inflicted corporal injury on S.—to which we have referred before as the Super Bowl Sunday incident, the laundry room incident, and the van ride. The People's broad assertions go nowhere toward establishing that defendant induced one or more of the children to commit or assist in the commission of one or more of *these* crimes in particular.

Notwithstanding the People's argument, we must consider, with respect to each of the four crimes at issue, whether "the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least [one of the] aggravating circumstance[s that the trial court found true] had [those circumstances] been submitted to the jury . . . ." (*People v. Sandoval, supra*, 41 Cal.4th at p. 839.) Unless we can make this determination and

be persuaded it is true beyond a reasonable doubt, we cannot find the *Cunningham* error harmless. (See *Sandoval*, at p. 839.) To assist in this task, we set forth the following brief summary of each of the offenses:

—Criminal Threat (count VI)

This offense occurred when, while questioning S. about the slip of paper he found in her purse, defendant told her, "I'll kill you now."

—Inflicting Corporal Injury on a Spouse (count IX)

This offense occurred when defendant hit S. in the ribs with his middle knuckle on Super Bowl Sunday.

—Inflicting Corporal Injury on a Spouse (count XIII)

This offense occurred when defendant hit S. in the face and the side during the van ride.

—Inflicting Corporal Injury on a Spouse (count XVII)

This offense occurred when defendant hit S. with his fists and various objects in the garage and in the laundry room.

### 1. *Participation of Others*

We are aware of no evidence suggesting that defendant induced others to participate in the commission of any of the four crimes at issue here or that he occupied a position of leadership or dominance of other participants in the commission of those crimes. No one else was involved in threatening to kill S. and no one else was involved in the beatings he gave her. The closest the People come to hinting at any such evidence is their assertion that defendant "ask[ed] his sons to load the car and bring weapons on the night that the family drove to Rocklin"—i.e., on the night of the van ride to Roseville, during which defendant hit S. in the face and side. The only evidence the People cite in support of this assertion, however, is defendant's testimony that when his sons asked if they could bring their paintball guns along on the van ride, he "just stupidly said, 'Yeah.'" The People fail to explain how evidence that defendant allowed his sons to bring along paintball guns would have supported a jury finding that the boys were participants in his later beating of their mother during the van ride. Thus, we cannot conclude beyond a reasonable doubt that the jury would have found this aggravating circumstance true with regard to any of the four crimes.

### 2. *Inducement of Minor*

Based on the same reasoning set forth above, we cannot conclude beyond a reasonable doubt that the jury would have found defendant induced a minor to commit or assist in any of the four crimes at issue here.

### 3. *Planning, Sophistication, and Professionalism*

With the nature of defendant's crimes in mind—a threat to kill S. and three different beatings of her under various circumstances—we cannot conclude beyond a reasonable doubt that the jury would have found the crimes at issue were carried out with planning, sophistication, and professionalism. It is just as likely, if not more so, that the jury would have found they were *not* planned, sophisticated, or professional.

### 4. *Position of Trust or Confidence*

The People suggest the jury would have found this aggravating circumstance true because defendant "testified that he was the father and sole economic provider in his household during the relevant time." But the fact that defendant was the children's father and the sole source of income says nothing about whether he *took advantage* of that position to commit the crimes at issue here. While the jury might have found that defendant somehow took advantage of his position in the household to commit one or more of the beatings of S. at issue here, we cannot conclude beyond a reasonable doubt that the jury would have made that finding.

### 5. *Violent Conduct*

It is beyond contradiction that in inflicting corporal injury on S., defendant engaged in violent conduct. However, "To the extent that violence does not exceed the force necessary to consummate the crime(s), it may not be used to aggravate the base term." (*People v. Key* (1984) 153 Cal.App.3d 888, 901, fn. 18 [203 Cal.Rptr. 144].) Here, the jury's verdicts provide several reasons to doubt that the jury would have found that defendant's violent conduct exceeded the force necessary to consummate the crime of inflicting corporal injury on a spouse. First, with regard to the Super Bowl Sunday incident, the jury found that defendant did *not* personally inflict great bodily injury on S. in the commission of that offense. Second, with regard to the van ride to Roseville incident, although the jury found defendant inflicted corporal injury on S., the jury was unable to reach a verdict on the charge that he assaulted her by means of force likely to produce great bodily injury. Third, with regard to the laundry room incident, both of those circumstances are true: (1) the jury found that defendant did *not* personally inflict great

bodily injury on S. in the commission of that offense; and (2) the jury found defendant inflicted corporal injury on S. but was unable to reach a verdict on the charge that he assaulted her by means of force likely to produce great bodily injury.

Given the foregoing, we cannot conclude beyond a reasonable doubt that the jury would have found defendant engaged in violent conduct that exceeded the force necessary to consummate the crimes, nor can we conclude beyond a reasonable doubt that the jury would have found defendant's violent conduct was sufficient to indicate he posed a serious danger to society.

Because we are not persuaded beyond a reasonable doubt that the jury would have found at least one of the aggravating circumstances on which the trial court relied true had the jury been instructed to those circumstances, we cannot say the *Cunningham* error here was harmless. Accordingly, we must reverse the upper term sentences on counts VI, IX, XIII, and XVII and remand the case for resentencing pursuant to *People v. Sandoval, supra,* 41 Cal.4th at pages 843–858.

B

*Cruel and Unusual Punishment*

In advance of his sentencing, defendant filed a motion objecting to the imposition of the statutorily required life sentence for torture (see § 206.1), arguing that a life sentence would violate the proscriptions against cruel or unusual punishment in the state and federal Constitutions. In arguing the motion, defense counsel asserted (among other things) that the court could consider "items in jurors' declarations" asserting that defendant "should not receive a life sentence for what they found him guilty."

In ruling on the motion, the court considered the three "techniques" identified in *In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921] for determining whether a particular punishment is so disproportionate that it shocks the conscience: examining the nature of the offense and the offender; comparing the punishment with the penalty for more serious crimes in the same jurisdiction; and comparing the punishment with the penalty for the same offense in other jurisdictions. (*Id.* at pp. 425–427.) In concluding the life sentence did not constitute cruel or unusual punishment, the court—when comparing the punishment for torture with the punishment for other crimes in California—observed (among other things) that with "a life sentence for torture, a person who receive[s] that sentence is eligible for parole in seven years."

As he did in the trial court, defendant contends on appeal his life sentence for torture constitutes cruel or unusual punishment. For the reasons set forth below, we disagree.

### 1. *California Constitution*

A punishment may violate the California Constitution if, although not "cruel or unusual" in its method, the punishment "is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch, supra,* 8 Cal.3d at p. 424, fn. omitted.) As noted above, our Supreme Court in *In re Lynch* identified three "techniques" used by courts to determine whether a particular punishment is so disproportionate that it shocks the conscience. (*Id.* at pp. 425–427.) Defendant's argument addresses all three techniques.

Before we turn to defendant's arguments on the three techniques, however, we pause to consider two other claims of threshold error he makes regarding the trial court's ruling. First, defendant complains that "[i]n assessing the severity of the life sentence imposed, the trial court improperly focused on the fact that a person sentenced to a simple life term is eligible for parole in seven years." Second, he complains that "[t]he court . . . erred in failing to give any consideration to the views expressed by jurors." In defendant's view, these errors by the trial court mean "the court did not engage in a constitutionally adequate analysis in rejecting [his] constitutional challenge" and therefore he "is entitled to a new sentencing hearing where his constitutional challenge can be assessed by a court applying the correct standard."

In support of his assertion of entitlement to a new sentencing hearing, defendant cites no authority, nor are we aware of any. Because the question of whether defendant's sentence amounted to cruel or unusual punishment is a question of law (see *People v. Williams* (1986) 180 Cal.App.3d 922, 926 [225 Cal.Rptr. 842]), we can "apply[] the correct standard" just as well as the trial court could. Thus, even if the trial court did err in the manner defendant asserts, remand is unnecessary, for we can determine ourselves, on de novo review, whether defendant's sentence was cruel or unusual.

With that in mind, we turn to defendant's arguments on the three techniques identified in *Lynch.* Turning to the first area of focus, "[i]n examining 'the nature of the offense and the offender,' we must consider not only the offense as defined by the Legislature but also 'the facts of the crime in question' (including its motive, its manner of commission, the extent of the defendant's involvement, and the consequences of his acts); we must also

consider the defendant's individual culpability in light of his age, prior criminality, personal characteristics, and state of mind." (*People v. Crooks* (1997) 55 Cal.App.4th 797, 806 [64 Cal.Rptr.2d 236].)

On this point, defendant's argument is relatively brief. He emphasizes that he had no prior criminal record, was 43 years old at the time of his arrest, and—as the trial court observed—"brought himself up from nothing and made a success of [his] career as both [a] prosecutor and defense attorney." As for the crime, he asserts it "represents a minimum violation of the torture statute" and did "not present the same level of brutality normally found in torture cases."

Like the trial court, we do not dispute defendant's "good qualities," as reflected in his lack of a criminal record and success in life prior to the crimes in this case. But we also agree with the trial court that "the facts of this case demonstrate that [defendant is] also capable of gross inhumanity and [he is] neither remorseful or contrite for what happened." Under the circumstances of this case, notwithstanding defendant's lack of a criminal record before these crimes, we cannot conclude a life sentence is so disproportionate to defendant's crime that it shocks the conscience and offends fundamental notions of human dignity.

Turning to the second technique—comparing the punishment with the penalty for more serious crimes in the same jurisdiction—the court in *People v. Barrera* (1993) 14 Cal.App.4th 1555 [18 Cal.Rptr.2d 395] noted that "[a] review of the statutes of California shows no crimes more serious than torture that are punished less severely." (*Id.* at p. 1570.) Defendant contends that "[e]very crime in the Penal Code that is punishable by a determinate term receives lesser punishment than [his] offense," including "rape, robbery, burglary, arson, carjacking, and child molesting." What defendant fails to show, however, is that these crimes are "more serious than torture." It has been said that " 'murder by torture was and is considered among the most reprehensible types of murder because of the calculated nature of the acts causing death . . . .' " (*Id.* at p. 1569.) The crime of torture shares the same calculated nature, specifically, the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or any sadistic purpose. Given the particularly reprehensible nature of the crime, we cannot conclude that a life sentence for torture violates the proscription against cruel or unusual punishment under the interjurisdictional technique from *Lynch*.

Finally, we turn to the third technique—comparing the punishment with the penalty for the same offense in other jurisdictions. For the most part, defendant's argument on this point seeks to compare the life sentence for torture in California with the potential sentence in other states for "[a]n act of violence that causes injury short of death." This is a flawed comparison because the crime of torture is more than simply a form of aggravated assault, and defendant does not show that the crimes in these other jurisdictions include the particularly reprehensible element of intending to cause cruel or extreme pain for purpose of revenge, extortion, persuasion, or any sadistic purpose. Absent similar elements, the comparison defendant suggests is like comparing apples and oranges. The two sentences defendant does identify for torture in other jurisdictions—a maximum term of 20 years under federal law and a maximum term of life under Michigan law for torture of a person held in custody—do not support defendant's argument that the life term in California is so disproportionate it shocks the conscience and offends fundamental notions of human dignity.

For the foregoing reasons, we reject defendant's argument under the California Constitution.

### 2. Federal Constitution

Defendant contends an analysis similar to that provided for in *Lynch* is required under the Eighth Amendment pursuant to *Solem v. Helm* (1983) 463 U.S. 277 [77 L.Ed.2d 637, 103 S.Ct. 3001]. Even if we accept that premise, it necessarily leads to the same conclusion we reached under California law—a life term for torture is not cruel or unusual punishment.

### C

### Conduct Credits

Under section 4019, "When a prisoner is confined in a county jail . . . following arrest and prior to the imposition of sentence for a felony conviction," that person usually earns two days of worktime/conduct credits for every four days of actual confinement. (§ 4019, subds. (a)(4), (f).) However, "Notwithstanding Section 4019 or any other provision of law, the maximum credit that may be earned against a period of confinement in, or commitment to, a county jail . . . following arrest and prior to placement in the custody of the Director of Corrections, shall not exceed 15 percent of the

actual period of confinement for any person . . ." "convicted of a felony offense listed in subdivision (c) of section 667.5." (§ 2933.1, subds. (c), (a).) Torture is such an offense. (See §§ 206.1, 667.5, subd. (c)(7).)

At sentencing here, the trial court determined defendant was entitled to 945 days of custody credits for actual time served and 141 days in worktime/conduct credits calculated at 15 percent pursuant to section 2933.1, subdivision (c). Defense counsel argued that because the court had sentenced defendant to serve three consecutive 180-day jail terms for the misdemeanor child abuse convictions, the 15 percent limit on worktime credits under section 2933.1 should not apply to the jail time deemed served on the misdemeanors and he should instead receive credits at the usual one-third rate for that time. The trial court disagreed and directed that defendant's actual presentence custody time, along with the 15 percent worktime/conduct credits, should first be applied to the sentences imposed on the misdemeanors, then any remaining time should be applied to the life sentence for torture (after service of the minimum seven years).

On appeal, defendant contends it was error for the court to apply the 15 percent limit to the time deemed served on the misdemeanors. According to defendant, the 15 percent limit applies only to "presentence" custody credited against a later prison sentence and time deemed served on a misdemeanor "is not *presentence* time credited against a prison sentence." In defendant's view, "When the court deducted time from [his] presentence time credit and treated it as time served on the misdemeanor counts, the time deducted was converted from 'presentence time' to 'term-serving time.' As such, it was no longer 'presentence time' subject to the limitation of Penal Code section 2933.1."

The validity of defendant's argument turns on the proper interpretation of subdivision (c) of section 2933.1. "[A]s with any statute," our role in interpreting that statute "is to ascertain the Legislature's intent so as to effectuate the purpose of the law. We accomplish this task if possible by giving the words of the statute their usual, ordinary meanings." (*In re Reeves* (2005) 35 Cal.4th 765, 770 [28 Cal.Rptr.3d 4, 110 P.3d 1218].)

As we have noted, under subdivision (c) of section 2933.1, for a person like defendant convicted of torture, "the maximum credit that may be earned against a period of confinement in, or commitment to, a county jail . . . following arrest and prior to placement in the custody of the Director of Corrections, shall not exceed 15 percent of the actual period of confinement . . . ." This limitation applies "[n]otwithstanding Section 4019 or any other provision of law." (§ 2933.1, subd. (c).)

There is nothing in the statute that restricts application of the 15 percent limit when some portion of the presentence jail time will ultimately be applied to satisfy jail terms on misdemeanor convictions sentenced contemporaneously with the felony conviction that triggers the application of section 2933.1. The statute simply says that when a person is convicted of a qualifying felony, worktime/conduct credits for any time served in jail from arrest to sentencing shall not exceed 15 percent, period. Thus, the statute does not compel, or even support, the result defendant advocates.

To support his argument, defendant relies on *People v. Adrian* (1987) 191 Cal.App.3d 868 [236 Cal.Rptr. 685], but that case is inapposite. It is true, as defendant notes, that in *Adrian* the court drew, in general terms, a distinction between "detention in jail or an equivalent facility prior to sentence . . . ('presentence time')" and "time in jail, prison, or equivalent facility while serving a sentence ('term serving time')." (*Id.* at p. 875.) But even accepting that subdivision (c) of section 2933.1 governs the calculation of custody credits for what *Adrian* called "presentence time," *Adrian* does not support defendant's assertion that what would otherwise be "presentence time" for purposes of the credit limit in subdivision (c) of section 2933.1 is retroactively converted into "term serving time" instead when the trial court sentences the defendant to a jail term for a misdemeanor along with a prison term for the felony that triggered the application of the statute. In the absence of any support for this novel conversion theory, defendant's argument that the trial court erred in calculating his custody credit fails.

### D

### *No-contact Order*

At sentencing, the trial court granted the People's request for a restraining order forbidding defendant from having any contact with S. or the children "unless they desire that." The court later clarified that it was imposing a "lifetime" restraining order.

On appeal, defendant contends the trial court had no authority to impose the no-contact order. The People concede error. We accept the concession. Because it had no authority to impose a no-contact order effective beyond the pendency of the criminal proceeding, the trial court erred. (See *People v. Stone* (2004) 123 Cal.App.4th 153, 160 [19 Cal.Rptr.3d 771].)

## DISPOSITION

The no-contact order is stricken, and the case is remanded to the trial court for resentencing consistent with this opinion. With these exceptions, defendant's convictions are affirmed.

Sims, Acting P. J., and Morrison, J.,* concurred.

A petition for a rehearing was denied March 9, 2009, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied June 10, 2009, S171464.

---

*Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.